57 F.3d 1078
NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Ricardo NUNEZ-FELIX, Defendant-Appellant.
 No. 93-50386.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Dec. 7, 1994.
Decided May 26, 1995.
 
 Appeal from the United States District Court, Southern District of California, D.C. No. 92-180-EBG; Earl B. Gilliam, District Judge, Presiding.
 S.D.Cal.
 REVERSED.
 Before: SCHROEDER, FLETCHER, and THOMPSON, Circuit Judges
 MEMORANDUM*
 Ricardo Nunez-Felix appeals his jury trial conviction of one count of aiding and abetting the importation of cocaine in violation of 28 U.S.C. Secs. 952 & 960, and 18 U.S.C. Sec. 2, one count of official corruption in violation of 18 U.S.C. Sec. 201(b)(2)(C), one count of conspiracy to launder monetary instruments in violation of 18 U.S.C. Secs. 371 & 1957, and one count of aiding and abetting laundering monetary instruments in violation of 18 U.S.C. Secs. 2 & 1957. Nunez-Felix contends that the district court erred in denying his motion to suppress inculpatory statements made to FBI agents. We have jurisdiction, 28 U.S.C. Sec. 1291, and reverse and remand.
 FACTS
 The following facts are drawn from the district court's findings of fact in response to Nunez-Felix's motion to suppress and the testimony of FBI agents Medina and Diaz, which the district court found credible.
 On the morning of February 11, 1992, FBI agents Diaz and Medina knocked on Nunez-Felix's door. The agents suspected that Nunez-Felix -- an INS inspector at the Calexico, California, port of entry -- was assisting drug smugglers in bringing illegal drugs across the border. The agents had uncovered evidence implicating Nunez-Felix. Pen registers and phone records indicated more than 200 phone calls from and to Ruiz-Pelayo, a suspected drug smuggler, who had identified Nunez-Felix as the INS inspector assisting her following her recent arrest by DEA agents.[1] Agents Medina and Diaz also knew that four vehicles loaded with cocaine had come across the border at Calexico while Nunez-Felix was on duty.
 When Elisa Nunez-Felix answered the door, the agents introduced themselves and asked if they could talk with her husband. Nunez-Felix came to the door and the agents told him that they were investigating Ruiz-Pelayo and would like to question him about his relationship with her. The agents were invited in and seated at the dining room table. Before the questioning began, Agent Diaz told Nunez-Felix that he was not under arrest; he was free to leave at any time. Nunez-Felix was told that he was not required to answer any questions, and if he chose not to answer any questions, no adverse action would be taken by his employer, the INS. Nunez-Felix agreed to answer some questions but appeared to be slightly nervous.
 The agents asked Nunez-Felix about his relationship with Ruiz-Pelayo and his knowledge of four cars which had crossed the border at the Calexico port of entry with 1,500 kilograms of cocaine in their trunks. Nunez-Felix denied knowledge of the cars and stated that his association with Ruiz-Pelayo was only occasional and social.
 About thirty to forty minutes after the interview began, the interrogation, which had been relaxed and non-confrontational up to that point, turned suddenly accusatory. The agents accused Nunez-Felix of lying and sought to convince him to change his tune by bringing more FBI agents into the house and confronting him with evidence of his involvement in the drug smuggling operation.
 The agents announced that they had a search warrant for Nunez-Felix's home, and six to eight additional FBI agents entered the house and began to search while Nunez-Felix watched.
 The agents then bore down with facts to contradict and accuse. Nunez-Felix was told that Ruiz-Pelayo had been arrested and had informed DEA agents that Nunez-Felix was the INS inspector who had helped her to smuggle drugs across the border. Nunez-Felix was shown photographs of the cars laden with drugs and told that the agents knew that he was on duty when the cars came across the border. The agents told Nunez-Felix that pen register records indicated that there were over 200 phone calls between his and Ruiz-Pelayo's phone numbers. One of the agents said, "What do you think we are, stupid?" Finally, Nunez-Felix was told he was facing "harsh penalties." The efforts to persuade Nunez-Felix to recant and confess continued even after he became so nervous that he was visibly shaking.
 The agents' effort to convince Nunez-Felix to confess succeeded. Although he initially resisted the agents' attempts to elicit a confession, he eventually admitted his involvement with Ruiz-Pelayo in smuggling drugs. At the end of it, Agent Diaz asked Nunez-Felix if he would sign a written statement. Nunez-Felix agreed to sign. Agent Diaz handwrote the confession, consulting with Nunez-Felix as to some words and phrases. Diaz included a statement that the declaration had been given "freely and voluntarily," and "without threats or promises," and that Nunez-Felix had been "free to leave." When Diaz was done, Nunez-Felix reviewed the statement, made some corrections, stated it was correct, and signed it.
 Diaz called the U.S. Attorneys office and advised them of Nunez-Felix's signed confession. He was instructed to mirandize and arrest Nunez-Felix and then obtain another written statement, which he did. Nunez-Felix signed a second confession reaffirming the earlier statement to the agents. The questioning and confession lasted nearly four hours.
 PRIOR PROCEEDINGS
 Nunez-Felix was indicted on the following charges: aiding and abetting the importation of approximately 1,419 kilograms of cocaine, 21 U.S.C. Secs. 952 & 960, 18 U.S.C. Sec. 2; official corruption, 18 U.S.C. Sec. 201(b)(2)(C); conspiracy to launder monetary instruments, 18 U.S.C. Secs. 371 & 1957; and aiding and abetting laundering monetary instruments, 18 U.S.C. Secs. 2 & 1957.
 Before trial, Nunez-Felix moved to suppress his incriminating statements. The district court denied the motion and the statements were admitted in the prosecution's case-in-chief at trial. The jury returned a guilty verdict on all counts. The district court sentenced Nunez-Felix on April 12, 1993, and corrected the sentence in respect to the fine on April 20, 1993.
 On appeal, Nunez-Felix challenges: (1) the denial of his motion to suppress his confessions; (2) the district court's incomplete factual findings regarding suppression; (3) the district court's failure to disclose the identity of the confidential informant; (4) the sufficiency of the evidence on the conspiracy count; (5) the effectiveness of his counsel at sentencing; and (6) the correction of the written judgment in violation of Rule 35(c).
 DISCUSSION
 Nunez-Felix claims that the district court erred by failing to suppress his confessions. He argues that his first confession was involuntary because it was the product of official coercion and that his second confession, which came after he had been arrested and read his Miranda rights, was tainted by the first unwarned confession.[2] We agree.
 We review de novo the district court's denial of a motion to suppress. See United States v. Homick, 964 F.2d 899, 903 (9th Cir. 1992).
 * Nunez-Felix contends that his first confession was involuntary because it was the result of official coercion.
 * We review de novo whether the defendant's inculpatory statement was voluntary. Greenawalt v. Ricketts, 943 F.2d 1020, 1027 (9th Cir. 1991), cert. denied, 113 S. Ct. 252 (1992). "On appeal, we must 'examine the entire record and make an independent determination of the ultimate issue of voluntariness."' United States v. Tingle, 658 F.2d 1332, 1335 (9th Cir. 1981) (citing Lego v. Twomey, 404 U.S. 477, 489 (1972)). Before a criminal defendant's statement can be used against him, the government must prove by a preponderance of the evidence that the statement was voluntary. Colorado v. Connelly, 479 U.S. 157, 168-69 (1986); United States v. Guerrero, 847 F.2d 1363, 1365 (9th Cir. 1988).
 An inculpatory statement is voluntary only when it is the product of a rational intellect and a free will. Medeiros, 889 F.2d at 823; Guerrero, 847 F.2d at 1365 (citing Blackburn v. Alabama, 361 U.S. 199, 208 (1960)). The test for voluntariness is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne. Id. at 1365-66 (citations omitted); see also Commonwealth of N. Mariana Islands v. Mendiola, 976 F.2d 475, 485 (9th Cir. 1992) (noting that psychological coercion can constitute police misconduct as required for finding that confession is involuntary) (citing Colorado v. Connelly, 479 U.S. 157, 164 (1986)); Collazo v. Estelle, 940 F.2d 411, 416-17 (9th Cir. 1991) (en banc) ("Interrogation tactics need not be violent or physical in nature to be deemed coercive. Psychological coercion is equally likely to result in involuntary statements, and thus is also forbidden.") (citing Mincey v. Arizona, 437 U.S. 385, 401 (1978)), cert. denied, 112 S. Ct. 870 (1992); United States v. Tingle, 658 F.2d 1332, 1336 (9th Cir. 1981) ("A confession is voluntary whether coerced by physical intimidation or psychological pressure.") (citing Townsend v. Sain, 372 U.S. 293, 307 (1963)).
 B
 As to his first confession, Nunez-Felix argues that the agents' interrogation techniques, calculated to exact the maximum psychological stress, were coercive and successful in eliciting his confession. We agree.
 It is beyond cavil that Nunez-Felix did not volunteer his inculpatory statements; he recanted and confessed only after the agents had invoked their coercive tactics. After Nunez-Felix's several denials, the agents altered the interrogation to take on a sharp accusatorial tone. After the first 30 to 40 minutes of questioning had passed and Nunez-Felix had answered all of the agents' questions concerning Ruiz-Pelayo and the cars at the border, but not to the agents' liking, he was suddenly and repeatedly accused of lying. At this same time, the agents announced that they possessed a search warrant for his home, which they proceeded to execute. The announcement was followed by the dramatic entry of six to eight additional agents, turning what would normally be considered a benign home setting for an interrogation into a police-dominated environment. Cf. United States v. Harrison, 34 F.3d 886, 892 (9th Cir. 1994) (finding that presence of fifteen armed federal agents in suspect's home contributed to finding of involuntariness) (citing United States v. Tingle, 658 F.2d 1332, 1335 (9th Cir. 1981)). The agents confronted Nunez-Felix with evidence of guilt, including the information that he had been "set up" by Ruiz-Pelayo. Furthermore, Nunez-Felix was not warned that his statements could be used against him or that he had a right to have counsel present during the interrogation. Nunez-Felix was told that he was facing "harsh" penalties and that any cooperation would be reported to the prosecutor. See Guerrero, 847 F.2d at 1366 n.2 (promise to report cooperation may render subsequent statement involuntary if accompanied by other coercive practices) (citing Tingle, 658 F.2d at 1332). Finally, the interrogation lasted a very long time -- almost four hours. These tactics left Nunez-Felix literally shaking. Cf. Tingle, 658 F.2d at 1334 (finding involuntariness where suspect was "noticeably shaking").
 C
 The government points to several factors which it claims militate against a finding of involuntariness, none of which are persuasive.
 First, it notes that Nunez-Felix was in his home and was told that he was free to go. However, when the questioning turned harsh, and the many agents swarmed in to execute the search warrant, it is unlikely that Nunez-Felix felt free to go, even assuming that he might have thought so at the inception of the interview.
 Second, the government emphasizes that because Nunez-Felix was a law enforcement officer, the failure of the agents to inform Nunez-Felix of his rights is a de minimis, technical violation. We disagree. Such warnings could have been very important to him at this moment of stress. Furthermore, as a law enforcement officer he may well have been unusually susceptible to the agents' exhortations to cooperate. See Collazo, 940 F.2d at 422.
 Finally, the government points out that Nunez-Felix was not under the influence of drugs or alcohol and was reasonably well-educated. However, because the interrogation tactics here were not designed to confuse or mislead, but rather to coerce, such factors seem irrelevant.
 D
 In short, we conclude the government has not sustained its burden of showing that the agents' interrogation techniques were not calculated to break Nunez-Felix's will. Nunez-Felix's first confession was the result of more than a mere technical violation of Miranda; in the totality of the circumstances, Nunez-Felix's statement was involuntary, and the district court erred by failing to suppress it.
 II
 If the U.S. Attorney's office had not instructed Medina and Diaz to arrest Nunez-Felix, to mirandize him, and obtain another confession, our inquiry would be at an end. However, because the second confession was admitted into evidence, we must determine whether it was also involuntary.
 * In making our determination of whether the second confession was tainted by the first involuntary confession, we consider the following factors: 1) any break in the stream of events sufficient to insulate the statement from the effect of the prior coercion; 2) whether it can be inferred that the coercive practices had a continuing effect that touched the subsequent statement; 3) any passage of time between the confessions and contact with friends or family during that period of time; 4) any change in location of the interrogation; 5) whether the defendant was told that the first confession could not be used against him; 6) the identity of the interrogators; and 7) whether the conditions that would have precluded the use of a first statement had been removed. Collazo, 940 F.2d at 421; Wauneka, 770 F.2d at 1440-41.
 B
 Here, with the exception of the Miranda warning, the circumstances of the two confessions were much the same. We have no passage of time. Furthermore, Nunez-Felix was not informed that a second confession was being requested because the first was tainted. Finally, Nunez-Felix was interrogated by the same federal agents at the same location. We find, therefore, that the second confession was tainted by the first.
 III
 We must next determine whether the erroneous admission of the confessions was harmless. Arizona v. Fulminante, 111 S. Ct. 1246, 1257 (1991) (applying harmless error doctrine to coerced confessions).
 * The Government must prove "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Chapman v. California, 386 U.S. 18, 24 (1967). "To say that the error did not contribute to the verdict is ... to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." Yates v. Evatt, 111 S. Ct. 1884, 1893 (1991). Moreover, because a "confession is like no other evidence," we must "exercise extreme caution before determining that the admission of the confession[s] at trial was harmless." Fulminante, 111 S. Ct. at 1257-58. As Justice Kennedy observed:
 [T]he court conducting a harmless-error inquiry must appreciate the indelible impact a full confession may have on the trier of fact, as distinguished, for instance, from the impact of an isolated statement that incriminates the defendant only when connected with other evidence. If the jury believes that a defendant has admitted the crime, it doubtless will be tempted to rest its decision on that evidence alone, without careful consideration of the other evidence of the case.
 Id. at 1266 (Kennedy, J., concurring). We find that here the confession could easily have altered the balance in the eyes of the jury.
 
 B
 
 1
 Our review of the record reveals that the confession was the centerpiece of the prosecution. The Government's attorney referred to it repeatedly during trial. It was the only evidence directly linking Nunez-Felix to the suspected drug smugglers. Without it, the government had only circumstantial evidence. Commonwealth of N. Mariana Islands v. Mendiola, 976 F.2d 474, 486 (9th Cir. 1992) (finding that state failed to meet burden of proving error harmless beyond reasonable doubt because circumstantial evidence not sufficient to convict) (citing Fulminante, 111 S. Ct. at 1258). And perhaps most tellingly, the Government did not arrest Nunez-Felix until after he confessed. Cf. Fulminante, 111 S. Ct. at 1258 (finding error not harmless where indictment filed only after defendant's confession).
 
 
 2
 Aside from the confession, the Government presented the following circumstantial evidence. More than 200 phone calls were made between Nunez-Felix's phone and phones used by Ruiz-Pelayo and David Sanchez. On two occasions when the Government received information that drugs were going to come across the border, Nunez-Felix swapped shifts with co-workers to work the midnight shift and appeared to be nervous. Nunez-Felix told one of his co-workers that he needed to change shifts so that he could watch his sons in a boxing tournament; his ex-wife testified that his sons do not box. Four cars containing cocaine in their trunks passed across the border on the second of these nights; the license plates for these cars were not in the computer system. Nunez-Felix did not normally accept overtime and received more phone calls at work than other INS inspectors. Nunez-Felix had INS documents in his home for Ruiz-Pelayo's minor son, a memo book with Ruiz-Pelayo and Sanchez' phone numbers, expensive jewelry, and nearly $10,000 in cash hidden in the house.[3] Nunez-Felix and his wife purchased a Chevrolet Suburban for approximately $25,000 cash. Finally, between 1989 and 1992, vendor and store receipts indicate that Nunez-Felix spent at least $331,907 in cash; these expenditures were not reported in his tax forms.
 
 C
 
 3
 Although the Government's remaining evidence is substantial, the admission of Nunez-Felix's confessions cannot be said to be "unimportant" in relation to everything else the jury considered. Collazo, 940 F.2d at 424. Without the confession, there was no direct evidence that Nunez-Felix had the requisite intent to commit count one, aiding and abetting the importation of cocaine, 21 U.S.C. Secs. 952, 960; 18 U.S.C. Sec. 2, and count two, bribery, 18 U.S.C. Sec. 201(b)(2)(C). Furthermore, count three for conspiracy to launder money, 18 U.S.C. Sec. 371 & 1957, and count four for aiding and abetting money laundering, 18 U.S.C. Secs. 2 & 1957, both depend on the underlying count of bribery. Without the confession, there was no direct evidence that Nunez-Felix waved the drug cars through in return for a bribe. Thus, it was not harmless error to admit the confession as to counts three and four.
 
 
 4
 We find that the Government has not carried its burden of proving that it was not harmless beyond a reasonable doubt for the district court to admit evidence of Nunez-Felix's confessions at trial.
 
 IV
 
 5
 Because we reverse on the confession issue, we need not reach Nunez-Felix's remaining arguments.
 
 
 6
 REVERSED and REMANDED.
 
 DAVID R. THOMPSON, Circuit Judge, dissenting:
 
 7
 Agents Diaz and Medina knocked on the door of the Nunez-Felix home. They identified themselves, stated they were conducting a narcotics-related investigation, and told Nunez-Felix they wanted to question him about his relationship with Ruiz-Pelayo. Nunez-Felix invited them in. The agents advised Nunez-Felix that he was not under arrest, he was free to leave, he did not have to answer any questions, and if he chose not to answer any questions, no adverse action would be taken against him by his employer, the INS.
 
 
 8
 Nunez-Felix had been a law enforcement officer with the INS for over ten years. He was familiar with the protections afforded by Miranda because, for purposes of his job, he had received training in constitutional rights. In fact, he had actually administered Miranda warnings to others in the course of his employment.[1]
 
 
 9
 With this knowledge reinforced by the agents' warnings, Nunez-Felix agreed to be interviewed. The entire interview was conducted in his home, where his family was present. Nunez-Felix was never restrained or threatened in any manner.
 
 
 10
 The majority concludes Nunez-Felix's confession was coerced because, after his initial denial of any knowledge or involvement in the smuggling operation, the agents confronted him with the evidence they had collected against him, informed him they had a search warrant for the premises, told him he faced serious charges which carried potentially severe penalties, and encouraged him to help himself out by telling the truth. The majority believes the fact that other agents executed the search warrant while the interview continued, and the length of the interview itself, contributed to the "coercive" nature of the interrogation. Based on these facts, and the fact that Nunez-Felix was shaking when he confessed, the majority finds it "undisputed" that Nunez-Felix did not volunteer his inculpatory statements.[2]
 
 
 11
 I must respectfully disagree. The interview was not rendered coercive because, during the course of the interrogation, Nunez-Felix was informed of the evidence against him. Truthful assertions by interrogating agents that the evidence collected in the case conflicts with the suspect's story do not render involuntary any subsequently obtained confession. See United States v. Crespo de Llano, 838 F.2d 1006 (9th Cir. 1987) (finding no coercion where agents told defendant they "knew" she had cocaine in the apartment and asked her to reveal its location so they would not have to tear the house apart). Most interrogations are conducted precisely in this manner. We would substantially cripple the investigatory capacities of law enforcement agents were we to prohibit them from confronting a suspect with discrepancies between his story and the evidence uncovered in the case.
 
 
 12
 Similarly, we have held it is not coercive for an interrogating agent to suggest, expressly or impliedly, that the suspect's cooperation may lead to lenient treatment.[3] United States v. Leon Guerrero, 847 F.2d 1363, 1366 (9th Cir. 1988); United States v. Kelley, 953 F.2d 562, 565 (9th Cir. 1992). Nor does an agent's truthful recitation of the potential sentence the suspect may receive constitute the type of psychological coercion that would render a subsequently obtained statement involuntary. United States v. Bautista-Avila, 6 F.3d 1360, 1365 (9th Cir. 993).
 
 
 13
 I am not persuaded Nunez-Felix's admission was involuntary by the facts that he was interrogated for four hours, his home was searched during the interview, and he was shaking when he confessed. The agents had a search warrant. They acted properly in searching the premises. There is no indication they used the fact of the search to intimidate Nunez-Felix into confessing.[4] Nunez-Felix was not under arrest and was free to terminate the interview at any point.[5] Finally, Nunez-Felix was nervous and shaking because he realized the agents had evidence which incriminated him, not because the agents employed psychological tactics calculated to break his will. See United States v. Miller, 984 F.2d at 1031 (irrelevant that defendant became tearful because "'mere emotionalism and confusion' do not necessarily invalidate confessions").
 
 
 14
 We can assume Nunez-Felix would not have confessed had the agents not persisted in questioning him after he denied any knowledge or involvement in the drug smuggling. However,
 
 
 15
 [t]he test of voluntariness is not a "but-for" test. "[W]e do not ask whether the confession would have been made in the absence of the interrogation. Few criminals feel impelled to confess to the police purely of their own accord, without any questioning at all.... Thus, it can almost always be said that the interrogation caused the confession."
 
 
 16
 United States v. Miller, 984 F.2d at 1032 (quoting Miller v. Fenton, 796 F.2d 598, 605 (3d Cir.), cert. denied, 479 U.S. 989 (1986)). The appropriate question is whether the interrogation tactics employed, considered in conjunction with the personal characteristics of the defendant, amounted to psychological pressure so extreme that it actually broke the defendant's will and induced an involuntary confession. In this case I think the answer is a resounding no.[6]
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir. R. 36-3
 
 
 [1]
 Ruiz-Pelayo is also known as "Magdalena Maloof."
 
 
 [2]
 Nunez-Felix also argues that his first confession was the product of a custodial interrogation. However, because a second, Mirandized confession was obtained, and because we find that the first statements were involuntary due to the agents' psychological coercion, it is not necessary for us also to address the question of whether the first confession was the product of a custodial interrogation. See Greenawalt v. Ricketts, 943 F.2d 1020, 1027 (9th Cir. 1991) ("Because Miranda's prophylactic rule 'sweeps more broadly than the Fifth Amendment itself,' a voluntary confession merely inadmissible on the ground of Miranda does not taint a subsequent voluntary confession.") (citing Oregon v. Elstead, 470 U.S. 298, 306 (1985)), cert. denied, 113 S. Ct. 252 (1992); see also United States v. Gonzalez-Sandoval, 894 F.2d 1043, 1049 (9th Cir. 1990); Medeiros v. Shimoda, 889 F.2d 819, 823-25 (9th Cir. 1989), cert. denied, 496 U.S. 938 (1990); United States v. Wauneka, 770 F.2d 1434, 1440 (9th Cir. 1985)
 
 
 [3]
 During the course of his confession, Nunez-Felix also told the agents about a safe containing $23,000 in cash at his sister's house. However, because this evidence was obtained as a result of the coerced confession, it would also be excluded
 
 
 [1]
 As the majority recognizes, the voluntariness of a confession is determined by considering the totality of the circumstances and their effect on the will of the defendant. Nonetheless, the majority holds Nunez-Felix's law enforcement background and his familiarity with Miranda do not "militate against a finding of involuntariness." I disagree. The pivotal question in any case of alleged coercion is whether the defendant's will was overborne when he confessed. United States v. Miller, 984 F.2d 1028, 1031 (9th Cir.), cert. denied, 114 S. Ct. 258 (1993). The defendant's personal circumstances--including his age, intelligence level, and familiarity with the criminal justice system--are critically relevant to this inquiry. United States v. Kelley, 953 F.2d 562, 565 (9th Cir. 1992) (recognizing that totality of circumstances includes "both the characteristics of the accused and the details of the interrogation"). See also United States v. Miller, 984 F.2d at 1032 (fact that defendant was 48 years old, college educated, and a twenty year veteran Special Agent of the FBI who, for fifteen of those years, was a criminal investigator contributed to finding of voluntariness)
 
 
 [2]
 The majority must mean that the involuntariness of Nunez-Felix's confession is "indisputable," rather than "undisputed." The government ably disputed Nunez-Felix's contention that his confession was coerced in the proceedings before the district court, in its appellate briefs, and in oral argument before this court. The voluntariness of the confession is a central issue in this appeal, as is apparent from the majority opinion itself
 
 
 [3]
 In contrast, threatening to inform the prosecutor of a suspect's refusal to cooperate is a violation of the suspect's Fifth Amendment right to remain silent. United States v. Tingle, 658 F.2d 1332, 1336 n.5 (9th Cir. 1981); United States v. Harrison, 34 F.3d 886, 891-92 (9th Cir. 1994). See also Collazo v. Estelle, 940 F.2d 411 (9th Cir. 1991) (coercive to suggest suspect may be penalized for exercising his right to an attorney), cert. denied, 502 U.S. 1031 (1992). Nothing of this nature occurred in this case
 
 
 [4]
 This case is distinguishable from United States v. Harrison, 34 F.3d 886 (9th Cir. 1994), which the majority cites in support of its contention that executing the search warrant while Nunez-Felix was being questioned contributed to the creation of a coercive environment. In Hernandez, the defendant confessed after fifteen federal agents entered her home with their guns drawn, searched the house, arrested her and her companion, and carted her companion off to jail. Id. at 890, 892. More importantly, the finding of coercion in Harrison was based exclusively on the fact that "an agent implied that if Harrison did not give a statement he would inform the court that she had not cooperated." Id. at 889. The court held that "there are no circumstances under which law enforcement officers may suggest that a suspect's exercise of the right to remain silent may result in harsher treatment by a court or prosecutor." Id. at 891-92
 
 
 [5]
 The majority finds it "unlikely" that Nunez-Felix felt free to terminate the interview once the tone of the questioning became confrontational and more agents entered the house in order to execute the search warrant. Although in footnote 2 of its opinion the majority explicitly declines to decide whether Nunez-Felix's confession was the product of an unwarned custodial interrogation, this finding is essentially a conclusion that it was. See United States v. Henley, 984 F.2d 1040, 1042 (9th Cir. 1993) (a defendant is in custody for purposes of Miranda if he reasonably believes he is not free to leave). I disagree, for the same reasons on which I base my conclusion that Nunez-Felix's confession was voluntary. There was nothing coercive about the manner in which the agents conducted the interrogation, Nunez-Felix was specifically told he was not under arrest, and he knew his rights under Miranda
 
 
 [6]
 Because I believe Nunez-Felix's first confession was neither involuntary nor the product of an unwarned custodial interrogation, I would also hold that nothing precluded admission of his second statement, which was made after his Miranda rights were administered