**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Sonja HARRISON, Defendant–Appellant.**

No. 93–50598.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 1, 1994.

Decided Sept. 8, 1994.

David Bortman, Los Angeles, CA, for defendant-appellant.

Monica Bachner, Asst. U.S. Atty., Los Angeles, CA, for plaintiff-appellee.

Before: BROWNING, FARRIS, and LEAVY, Circuit Judges.

FARRIS, Circuit Judge.

Sonja Harrison appeals her conviction for money laundering in violation of 18 U.S.C.

§ 1956(a)(1)(B). She argues that the district court erred in admitting a statement she gave to federal agents at the time of her arrest and in instructing the jury regarding the coconspirator exception to the hearsay rule. We have jurisdiction, 28 U.S.C. § 1291, and we reverse.

## I

In 1990, Harrison purchased two properties with funds provided by Pierre Clifton Marshall, her companion and the father of her children. She lived in the first, a house in Canoga Park, California, and managed the second, an apartment complex in Inglewood, California. To make the down payment for the home, Harrison used four cashier's checks. Each of the checks was for less than $10,000, the amount triggering federal reporting requirements. 31 C.F.R. § 103.-22(a)(1). To make the down payment for the apartment complex, Harrison used $55,000 in cash, which Marshall had provided. The escrow documents for both properties reflected purchase prices that were less than the actual amounts Harrison and Marshall paid.

The government contends that Harrison used proceeds from Marshall's drug trafficking to pay for the properties. On May 28, 1992, a federal grand jury returned a six-count indictment against Harrison and Marshall. The indictment charged Harrison with one count of willfully structuring monetary transactions to avoid federal reporting requirements in violation of 31 U.S.C. § 5324 by arranging for the purchase of the four cashier's checks. The indictment further charged Harrison with two counts of laundering the proceeds from illegal transactions in violation of 18 U.S.C. § 1956(a)(1)(B) by underreporting the purchase prices of the house and apartment complex.

Harrison and Marshall were tried together. A jury convicted Harrison of laundering money through the purchase of the apartment complex, but acquitted her of the other money laundering and financial structuring charges. The court sentenced her to forty-eight months' custody. Harrison appeals.

## II

Harrison argues that she was prejudiced by the district court's statements to the jury regarding the admissibility of coconspirator statements. We reject the argument.

### A

During the trial, the government offered the testimony of a witness who stated that Harrison had said that she had shown the house in Canoga Park to Marshall. Counsel for Marshall objected on hearsay grounds. The prosecutor replied that he was relying on the coconspirator statement exception.[1] The court ruled that the witness's answer could be admitted conditionally and explained to the jury the coconspirator exception to the hearsay rule. The court stated that coconspirator hearsay is admissible if the government introduces sufficient evidence that there was a conspiracy, but that the government had not yet produced the necessary evidence. The court went on to explain:

> If it hasn't happened at some point during this trial I will tell you disregard entirely about what he is about to say; okay? ... But we're taking things in a certain order, and I'm assuming that the government is going to make a major effort to link up this thing as a conspiracy, and that's why I'm letting him say this right now, rather than call him back after it's already done.

Harrison's counsel objected to the judge's statement and argued that it would leave the impression that if the judge did not tell the jury that they should disregard the witness's answer, then he had decided that Harrison and Marshall had engaged in a criminal conspiracy. Counsel stated, "It sounds like if you don't tell them to disregard it, you find there was a conspiracy. It's like directing a verdict."

In response, the court gave the following curative instruction:

> My statement to you stands, and it is to this effect ... [that] at the end of the case

---

**1.** Federal Rule of Evidence 801(d)(2)(E) provides that a statement is not hearsay if it is offered against a party and is "a statement by a cocon-spirator of a party during the course and in furtherance of the conspiracy."

you are the people that are going to make the decision in the case. As a matter of evidence, normally it is necessary to have the government put on a substantial body of evidence about the conspiracy before the admission of a coconspirator statement. That doesn't mean that they have to prove the conspiracy; they have to put a substantial amount of evidence out there in front of you on the conspiracy before that—as a matter of the evidence—the statement can be introduced for the truth of the assertion. They haven't done that yet. And, as I said, they're going to make a major effort to do so, obviously. Whether they have done so is up to you. And if I determine that they have not put out a substantial body of evidence which would permit the admissibility of this statement, I will tell you that at some point in time.

But in any event, at the end of the trial I'm going to tell you that all these decision are yours; okay? You're the judges.

Harrison contends that the curative instruction only added to the confusion by suggesting that the jury could decide whether the testimony was admissible and failing to dispel the impression that unless the court informed them otherwise, it was ruling that Harrison and Marshall had engaged in a criminal conspiracy.

**B**

■ We review the district court's jury instructions for an abuse of discretion. *United States v. Johnson*, 956 F.2d 197, 199 (9th Cir.1992). A single instruction is not viewed in isolation, but in the context of the overall charge. *United States v. Marsh*, 894 F.2d 1035, 1040 (9th Cir.1989), *cert. denied*, 493 U.S. 1083, 110 S.Ct. 1143, 107 L.Ed.2d 1048 (1990).

■ "[O]nce the judge determines that the hearsay statements are admissible under the coconspirator exception, the jury should not be instructed that it must determine admissibility." *United States v. Peralta*, 941 F.2d 1003, 1008 (9th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1484, 117 L.Ed.2d 626 (1992). However, such an instruction constitutes reversible error only if a

defendant demonstrates that the instruction was prejudicial. *Id.*; *United States v. Lutz*, 621 F.2d 940, 946 n. 2 (9th Cir.), *cert. denied sub nom. White v. United States*, 449 U.S. 859, 101 S.Ct. 160, 66 L.Ed.2d 75 (1980).

■ Harrison has not shown that she was prejudiced by the instructions. The district court did not leave the question of admissibility to the jury. The curative instruction explained that although the court would decide whether the government had introduced sufficient evidence to satisfy the coconspirator exception to the hearsay rule, the jury was the ultimate fact finder as to the defendant's guilt or innocence. We agree with the Seventh Circuit's holding that while it is preferable not to instruct the jury about the coconspirator exception, a "vague, unclear, and possibly confusing" instruction does not amount to "a forceful *de facto* pronouncement to the jury that the government ha[s] convinced the judge that a conspiracy existed." *United States v. Peters*, 791 F.2d 1270, 1286 (7th Cir.), *cert. denied sub nom. Odoner v. United States*, 479 U.S. 847, 107 S.Ct. 168, 93 L.Ed.2d 106 (1986).

■ The district court's curative instruction, though at times ambiguous, was less confusing than the instruction in *Peters*. *Cf. id.* at 1286 n. 16. In the final jury instructions, the court again reminded the jurors that they were the trier of fact and that the government had the duty to prove every element of the crimes charged beyond a reasonable doubt. *Cf. Peralta*, 941 F.2d at 1008. Any potential harm from the court's comments was further mitigated by the fact that the government had not charged Harrison with conspiracy.

**III**

Harrison argues that the district court erred in allowing a federal agent to testify about the statement she gave at the time of her arrest. Because an agent implied that if Harrison did not give a statement he would inform the court that she had not cooperated, the testimony regarding her statement should have been excluded.

## A

At 10:00 on the night of February 27, 1992, Harrison heard noises outside her house. Upon opening her front door, she discovered approximately fifteen federal agents with their guns drawn. The agents searched the house and arrested Harrison and Marshall. Harrison gave a statement after her arrest. According to the government, in her statement Harrison described the details of the property transactions, admitted that it was her idea to pay cash outside of escrow, and said that she had mailed Marshall packages of drugs.

Before trial, Harrison moved to suppress her statement on the grounds that it was involuntary.[2] The court held an evidentiary hearing. Harrison and the agents gave different accounts of what had transpired before Harrison gave her statement. The court credited the agents' testimony.

The court found that the agents advised Harrison of her rights. She replied that she understood those rights. After a brief silence, an agent told Harrison that he had documents showing that she was involved in money laundering. He said that the government had seized packages of drugs that had been mailed to Marshall and could determine whether her fingerprints were on the packages. The agent informed her that she might be facing up to twenty years in prison. He asked her whether she thought it would be better if the judge were told that she had cooperated or had not cooperated. Harrison responded that it would be better if she talked to the agents and they told the judge that she had cooperated. She then gave a statement to the agents.

Based on these findings of fact, the district court concluded that the agents did not obtain Harrison's statement through coercion or improper inducement. The court allowed a government agent to testify at trial about Harrison's statement. On appeal, Harrison does not dispute the district court's findings of fact. Instead, she argues that even accepting these findings, the court erred in concluding she voluntarily agreed to give the statement.

## B

▮ We review de novo whether a statement was voluntary. *United States v. Willard,* 919 F.2d 606, 608 (9th Cir.1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 208, 116 L.Ed.2d 167 (1991).

▮ The government must prove by a preponderance of the evidence that the statement was voluntary. *Lego v. Twomey,* 404 U.S. 477, 488–89, 92 S.Ct. 619, 626–27, 30 L.Ed.2d 618 (1972); *United States v. Leon Guerrero,* 847 F.2d 1363, 1365 (9th Cir.1988). We consider the totality of the circumstances and determine whether "the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *Guerrero,* 847 F.2d at 1366; *Derrick v. Peterson,* 924 F.2d 813, 817 (9th Cir.1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 161, 116 L.Ed.2d 126 (1991).

In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court strictly curtailed any attempts by law enforcement officers to cajole a confession out of a suspect after they had advised her of her rights. The Court emphasized that once an individual has indicated in any manner that she does not wish to speak to the officers, all questioning must cease. *Id.* at 473–74, 86 S.Ct. at 1627–28. Mindful of the temptation to give the prescribed warnings with one breath and then, with the next, undercut them with coercive tactics and improper inducements, the Court announced that "any evidence that the accused was threatened, tricked or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive [her] privilege." *Id.* at 476, 86 S.Ct. at 1628–29.

In subsequent decisions, the Court has allowed officers more leeway to interact with or even directly question suspects after giving *Miranda* warnings. For example, in *Michigan v. Mosley,* 423 U.S. 96, 106–07, 96

---

**2.** Harrison also disputes the government's account of her statement. She denies ever having told the agents that she knew Marshall was a drug dealer, mailed drugs to him, or knowingly participated in money laundering or illegal financial structuring.

S.Ct. 321, 327–28, 46 L.Ed.2d 313 (1975), the Court held that the police did not violate *Miranda* when they initially honored the suspect's decision to remain silent and resumed questioning only after allowing a significant period of time to lapse and giving a fresh set of warnings. In *Oregon v. Bradshaw,* 462 U.S. 1039, 1045–46, 103 S.Ct. 2830, 2834–35, 77 L.Ed.2d 405 (1983) (plurality opinion), the Court held that although the suspect had initially invoked his right to counsel, further interrogation was permissible because he had reinitiated conversation by asking, "Well, what is going to happen to me now?" *See also id.* at 1050, 103 S.Ct. at 2837 (Powell, J., concurring in the judgment). As a result, courts must supervise the interactions between officers and a suspect that occur during the time between the officers' recitation of *Miranda* warnings and the suspect's waiver of her rights. The distinctions between the permissible and the taboo are at times so subtle that confusion may result.

■ We have held that the police generally may offer to tell the prosecutor about the defendant's cooperation and suggest that cooperation may increase the likelihood of a more lenient sentence. *Willard,* 919 F.2d at 608; *Guerrero,* 847 F.2d at 1366. At the same time, we have stated that "threatening to inform the prosecutor of a suspect's refusal to cooperate violates her fifth amendment right to remain silent." *Guerrero,* 847 F.2d at 1366 n. 5; *United States v. Tingle,* 658 F.2d 1332, 1336 n. 5. (9th Cir.1981); *see also Collazo v. Estelle,* 940 F.2d 411, 416–19 (9th Cir.1991) (*en banc* ), *cert. denied,* — U.S. ——, 112 S.Ct. 870, 116 L.Ed.2d 776 (1992). In many ways, both types of statements are simply different sides of the same coin: "waive your rights and receive more favorable treatment" versus "exercise your rights and receive less favorable treatment."

The two types of statements are not entirely interchangeable. Defendants may get some benefit from learning about the possibility of reduced sentences, though that benefit would hardly vanish if the government communicated the prospect of leniency through defendants' attorneys rather than at the time of arrest. We also have observed that in most circumstances, speculation that cooperation will benefit the defendant or even promises to recommend leniency are not sufficiently compelling to overbear a defendant's will. *Guerrero,* 847 F.2d at 1366.

■ None of the agents explicitly threatened Harrison with a longer sentence if she did not give them a statement. The improper conduct was the suggestion that they might inform the court that she had not cooperated. As we stated in *Tingle:*

> Although it is permissible for an interrogating officer to represent, under some circumstances, that the fact that the defendant cooperates will be communicated to the proper authorities, the same cannot be said of a representation that a defendant's failure to cooperate will be communicated to a prosecutor. Refusal to cooperate is every defendant's right under the fifth amendment. Under our adversary system of criminal justice, a defendant may not be made to suffer for his silence. Because there is no legitimate purpose for the statement that failure to cooperate will be reported and because its only apparent objective is to coerce, we disapprove the making of such representations.

658 F.2d at 1336 n. 5. Although the agents thinly veiled their implied message behind a rhetorical question, Harrison could only conclude that she might suffer for her silence.

The government argues that when viewed in context of all the circumstances, the agent's question did not overbear Harrison's will. The government points out that Harrison was not in a jail or a police station, but in her own home. She was a thirty-one year-old woman with two years of college education and had prior exposure to the criminal justice system. After the agents read the *Miranda* warnings, she responded that she understood her rights. Unlike *Tingle,* the agents did not threaten to tell the authorities that Harrison had been "stubborn or hardheaded" if she did not give them a statement. 658 F.2d at 1334.

■ We do not ignore the record, but there are *no* circumstances in which law enforcement officers may suggest that a suspect's exercise of the right to remain silent may result in harsher treatment by a court

or prosecutor. "[T]he admissibility of a confession turns as much on whether the techniques for extracting the statements, as applied to *this* suspect, are compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means as on whether the defendant's will was in fact overborne." *Miller v. Fenton*, 474 U.S. 104, 116, 106 S.Ct. 445, 452–53, 88 L.Ed.2d 405 (1985); *see also Derrick*, 924 F.2d at 819 ("[T]he voluntariness inquiry focuses on whether the police's conduct was constitutionally acceptable."). Even if Harrison were unusually resistant to psychological coercion, "the technique used here risks overcoming the will of the run-of-the-mill suspect." *Collazo*, 940 F.2d at 426 (Kozinski, J., concurring).

■ True, Harrison was in her home. But fifteen armed federal agents had just searched the house, arrested her, and taken her companion away to jail. While none of the agents made explicit threats, subtle psychological coercion can effectively overbear a suspect's free will. *Tingle*, 658 F.2d at 1335.

■ Harrison's initial comment to the agents before she gave her statement reveals the impact the agent's question had on her decision to waive her rights. Harrison broke her silence only after the agent asked whether she thought it preferable if the judge were informed that she had cooperated or not cooperated. The first thing she said was that she thought it would be better if she talked to the agents and they informed the judge that she had cooperated.

"[T]he Fifth Amendment guarantees ... the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty ... for such silence." *Malloy v. Hogan*, 378 U.S. 1, 8, 84 S.Ct. 1489, 1493–94, 12 L.Ed.2d 653 (1964). The agent's question was improper. The government cannot meet its burden of proving that Harrison decided of her own free will to give a statement. All testimony regarding her statement should have been excluded from trial.

## C

■ The admission of an involuntary statement is reviewed for harmless error. *Arizona v. Fulminante*, 499 U.S. 279, 310–12,

111 S.Ct. 1246, 1265–66, 113 L.Ed.2d 302 (1991). On direct review a constitutional error requires reversal unless the government proves "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); *see also Brecht v. Abrahamson*, — U.S. —, — — —, 113 S.Ct. 1710, 1721–22, 123 L.Ed.2d 353 (1993) (distinguishing the harmless error standard on direct review from that on collateral review).

The government emphasizes that independent documentary and testimonial evidence supported the jury's conclusion that Harrison had laundered Marshall's drug trafficking profits through the apartment complex. A real estate broker testified that Marshall had agreed to pay the seller additional cash outside of escrow. The government introduced a signed document memorializing this agreement. After the sale, Harrison managed the apartment complex. To establish Harrison's knowledge of the illegal source of Marshall's cash, the government introduced mailing labels addressed in Harrison's handwriting, which had been used to mail packages of drugs to Marshall.

■ The government's argument ignores the qualitative impact of allowing the jury to hear in Harrison's own words how she financed the real estate transactions. We recently discussed the " 'striking difference between appellate review to determine whether an error affected a judgment and the usual appellate review to determine whether there is substantial evidence to support a judgment.' " *Standen v. Whitley*, 994 F.2d 1417, 1423 (9th Cir.) (quoting Roger Traynor, *The Riddle of Harmless Error*, 27 (1970)), *cert. denied*, — U.S. —, 114 S.Ct. 579, 126 L.Ed.2d 579 (1993). Review for harmless error requires not only an evaluation of the remaining incriminating evidence in the record, but also " 'the most perceptive reflections as to the probabilities of the effect of error on a reasonable trier of fact.' " *Id.* (quoting Traynor, *supra*, at 30).

A defendant's own account of the motive and means for the crime " 'is probably the most probative and damaging evidence that can be admitted against' " her and "may tempt the jury to rely upon that evidence alone in reaching its decision." *Fulminante,* 499 U.S. at 296 (quoting *Bruton v. United States,* 391 U.S. 123, 139–40, 88 S.Ct. 1620, 1629–30, 20 L.Ed.2d 476 (1968) (White, J., dissenting)); *Collazo,* 940 F.2d at 424. Harrison's statement, as recounted at trial by the agent, provided a detailed account of the crimes charged and established Harrison knew that the packages she mailed Marshall contained drugs. Moreover, the discrepancies between Harrison's testimony and the agent's account of her statement would have affected a reasonable juror's assessment of her credibility. *Collazo,* 940 F.2d at 426.

The district court acknowledged that Harrison's statement played a significant role in the government's case. At the evidentiary hearing, the court observed that "once she started talking, as the old saw goes, she sang like a birdie. I mean it was a very, very complete review of all of these issues, if you take at face value the reports of the interview on the evening in question." Further, the jury's decision to acquit Harrison of the other money laundering and financial structuring charges impacts upon our holding.

The government has failed to sustain its burden of proving beyond a reasonable doubt that the use of Harrison's statement during trial was harmless error. At retrial, her statement will be suppressed.

We REVERSE Harrison's conviction, VACATE her sentence, and REMAND.