**STATE of Alaska, Appellant,**

v.

**Rachelle WATERMAN, Appellee.**

**No. A–9634.**

Court of Appeals of Alaska.

Dec. 5, 2008.

Diane L. Wendlandt, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Talis J. Colberg, Attorney General, Juneau, for the Appellant.

Beth G.L. Trimmer, Assistant Public Advocate, and Joshua Fink, Public Advocate, Office of Public Advocacy, Anchorage, for Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

COATS, Chief Judge.

On November 14, 2004, near Craig, Alaska, hunters found the body of Lauri Waterman. Carl (Doc) Waterman, Lauri's husband, and her sixteen-year-old daughter, Rachelle, were out of town for several days, returning home to Craig on the afternoon of November 14, 2004. Doc Waterman soon contacted the police and told them that both Lauri and her minivan were missing. The police interviewed both Doc and Rachelle Waterman on the evening of November 15, 2004.

The police investigation began to focus on two young men who were friends of Rachelle Waterman: Jason Arrant and Brian Radel. On the evening of November 17, 2004, Troopers Robert Claus and Robert McPherron interviewed Rachelle Waterman. The troopers met Waterman and her father at their home. Waterman agreed to talk with the troopers at the police station. After they reached the station, Waterman was informed of her right to have her father present. She declined. The troopers told Waterman that she did not have to talk with them and that

she was free to leave at any time. During this interview, Trooper McPherron told Waterman that he suspected that Arrant and Radel were involved in her mother's death and that Waterman might have unintentionally motivated them to kill her mother. Waterman denied saying anything that Arrant or Radel might have misconstrued as a request to kill her mother. But she did claim that her mother had physically abused her, and she acknowledged that she had told Arrant and Radel about the abuse. Waterman also stated that she may have told Arrant that she and her father were going to be out of town.

On November 18, 2004, Arrant told the troopers that Radel had killed Lauri Waterman. Arrant agreed to wear a recording device and talk with Radel. When Arrant talked to Radel, Radel implicated himself in the murder.

Several hours later, the troopers interviewed Radel, who confessed to the murder. The troopers arrested Radel. They arrested Arrant the next day. In interviews on November 19, 2004, Arrant admitted his participation in Lauri's murder and stated that Rachelle Waterman was also involved. Arrant stated that Waterman had told him she "wanted her [mother] dead." According to Arrant, Waterman told him when she and her father would be out of town and that this would be a good opportunity to kill her mother.

After the troopers interviewed Arrant, Trooper McPherron and Craig Police Sergeant Mark Habib interviewed Waterman the same day, November 19. They met Waterman at her home. Waterman agreed to go with the officers to the police station, where the officers read Waterman her *Miranda* rights and again informed her of her right to have her father present. Waterman waived her rights and declined to have her father present.

Trooper McPherron confronted Waterman with the information that both Arrant and Radel had implicated her in the murder. Waterman admitted that at one time she had mentioned to Arrant and Radel something about killing her mother, but stated that she was not serious and had told them that she did not want it done. She admitted telling them when she and her father were going to be gone, but she claimed that this information had just come up in casual conversation. She admitted that she had an idea that Arrant and Radel might try to kill her mother that weekend but insisted that she had told them not to do it. She claimed that she telephoned them when she was in Anchorage and told them not to do it. Waterman called Arrant when she returned on Sunday, and he told her that the murder was done. Waterman said she was horrified.

Under continued questioning, Waterman ultimately conceded that she was "pretty sure" that Arrant and Radel were going to kill her mother while she was away for the weekend. She admitted that, even though she had a telephone conversation with Arrant that weekend, she had not told him that she had changed her mind about the murder.

The State indicted Waterman on several felony counts, including first- and second-degree murder and conspiracy to commit murder. Waterman moved to suppress her November 19 statement on the ground that the statement was involuntary. Waterman also moved to dismiss the indictment based upon a claim that the allegedly involuntary statement had been presented to the grand jury. Superior Court Judge Patricia A. Collins ruled that Waterman's November 19 statement was voluntary. She denied both motions.

Following a three-week jury trial, the jury was unable to reach a verdict. Judge Collins declared a mistrial. Waterman filed a motion for judgment of acquittal, arguing that there was insufficient evidence to show that she intended her mother's death. Judge Collins denied the motion for judgment of acquittal, but without notice to the parties, she sua sponte reconsidered her ruling on Waterman's claim that her November 19 statement was involuntary. Judge Collins reevaluated her ruling in light of the trial testimony and concluded that the State had not proven that Waterman's November 19 statement was voluntary. Judge Collins suppressed the November 19 statement and concluded that, because that interview was "the centerpiece

of the grand jury case against ... Waterman ... the indictment must be dismissed." The State appeals.

*Why we conclude that the State has a right to appeal Judge Collins's order dismissing the indictment*

█ Waterman contends that the State has no right to appeal Judge Collins's dismissal of the indictment because Judge·Collins's decision is not a final order for purposes of appeal. Waterman is correct that Judge Collins's dismissal of the indictment is not a final order—the judge did not bar the State from seeking a new indictment. Nevertheless, we conclude that the State has the right to pursue an interlocutory appeal of Judge Collins's decision.

Alaska law formerly gave the State a very limited right of appeal: The State could appeal only (1) the dismissal of an indictment or (2) a criminal sentence on the ground that it was overly lenient.[1] But, as construed in *State v. Shelton*,[2] the State's right to appeal the dismissal of an indictment was a right of *interlocutory* appeal.[3] In other words, the State's right to appeal did not hinge on whether the State was barred from seeking re-indictment.

In *State v. Michel*,[4] this court found that former AS 22.07.020(d)(2) allowed the State to appeal any final decision in a criminal case, subject only to the restraint of the guarantee against double jeopardy if it were successful.[5] But three years later, in *Kott v. State*,[6] the Alaska Supreme Court rejected this interpretation of the statute. The supreme court held that the State's power to appeal trial court decisions in criminal cases was limited to the appeals listed in the statute: appeals of orders testing the sufficiency of an indictment and appeals of criminal sentences on the ground that they were too lenient.[7]

As we explained in *State v. Walker*,[8] the Alaska Legislature responded to the supreme court's decision in *Kott* by amending AS 22.07.020(d)(2) to provide the State with a right of appeal "in all actions and proceedings within [the Court of Appeals's] jurisdiction except that ... the [S]tate's right of appeal in criminal cases is limited by the prohibitions against double jeopardy contained in the United States Constitution and the Alaska Constitution."[9]

In *Walker*, we held that this new statute implicitly incorporated the rule that an order is not appealable unless it is final.[10] However, *Walker* did not require us to examine how the new statute affected the State's pre-existing right to pursue interlocutory appeals of non-final orders dismissing indictments.

Based on the legislative history of the statute, we conclude that the legislature did not wish to abrogate this pre-existing right.

As we noted in *Walker*, the legislative proceedings leading to the enactment of the current version of AS 22.07.020(d)(2) "demonstrate an intent to *expand* the State's right of appeal in criminal cases."[11] In particular, Assistant Attorney General Gayle Horetski told the legislature about this court's decision in *Michel* and the supreme court's superseding decision in *Kott*.[12] The intent of the proposed amendment, Assistant Attorney General Horetski explained, was to alter the result of the supreme court's decision and return the law to its former interpretation under *Michel*.[13]

---

1. Former AS 22.05.010, as construed in *State v. Shelton*, 368 P.2d 817, 820 (Alaska 1962), and as enacted with respect to the court of appeals in former AS 22.07.020(d)(2).

2. 368 P.2d 817.

3. *Id.* at 820.

4. 634 P.2d 383 (Alaska App.1981).

5. *Id.* at 384–86.

6. 678 P.2d 386 (Alaska 1984).

7. *Id.* at 388–390.

8. 887 P.2d 971 (Alaska App.1994).

9. Ch. 71 § 2 SLA 1993; *Walker*, 887 P.2d at 975.

10. *Walker*, 887 P.2d at 975–76.

11. *Id.* at 975 (emphasis added).

12. *Id.* at 976.

13. *Id.*

Based on this legislative history, we concluded in *Walker* that the legislature intended to reestablish the rule announced by this court in *Michel*.[14] And the holding in *Michel* was that the State could appeal the dismissal of an indictment for any reason unless retrial would be barred by the Double Jeopardy Clause.[15] Although *Michel* refers to a "final judgment ... dismissing an indictment," this is because the order at issue in *Michel* was actually a final judgment—an order dismissing an indictment and barring any further proceedings against the defendant.[16] Nothing in *Michel* suggests that this court wished to, or had the authority to, deprive the State of its pre-existing right to pursue interlocutory appeals of non-final dismissals of an indictment.

Accordingly, even though the current version of AS 22.07.020(d)(2) does not contain a clause expressly authorizing the State to pursue this type of interlocutory appeal, we conclude that the legislature did not intend to deprive the State of this pre-existing appellate right and that this right survives the amendment of the statute.

*Voluntariness of self-incriminating statements*

■ Before the State can introduce a defendant's self-incriminating statement, the State must show by a preponderance of evidence that the statement was voluntary.[17] The State has a particularly heavy burden of proof when the accused is a juvenile.[18] In determining whether a statement is voluntary, we focus on whether "the conduct of law enforcement was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined."[19]

■ We review the trial court's determination of the voluntariness of a confession as a mixed question of fact and law.[20] The trial court engages in a three-part test to determine if a defendant's statement is voluntary: "First, the trial judge must find the external, phenomenological facts surrounding the confession. Second, from these external facts, the judge must infer an internal, psychological fact: the mental state of the accused. Finally, the judge must assess the legal significance of this inferred mental state."[21]

■ On appeal, we review the trial judge's findings of fact and her determination of the credibility of witnesses deferentially—we will reverse only if we find the trial judge's decision was clearly erroneous.[22] "In determining the accused's mental state and its legal significance, however, we conduct an independent examination of the entire record and base our conclusion upon the totality of circumstances surrounding the confession."[23]

In *Beavers v. State*, the Alaska Supreme Court held that when the police use threats of harsher punishment to induce a confession "the resulting confession should be considered involuntary unless the state can show affirmatively that the confession was voluntarily made."[24] In a footnote, the supreme court acknowledged that its prohibition of the use of threats might be more demanding than federal constitutional law.[25] It therefore based its holding on article I, section 9 of the Alaska Constitution.[26]

14. *Id.*

15. *Michel,* 634 P.2d at 385.

16. *Id.* at 384.

17. *Stobaugh v. State,* 614 P.2d 767, 771 (Alaska 1980) (citing *Schade v. State,* 512 P.2d 907, 917 (Alaska 1973)).

18. *Beavers v. State,* 998 P.2d 1040, 1044 (Alaska 2000) (citing *S.B. v. State,* 614 P.2d 786, 789 (Alaska 1980)).

19. *Stobaugh,* 614 P.2d at 772 (quoting *United States v. Ferrara,* 377 F.2d 16, 17 (2d Cir.1967)).

20. *Beavers,* 998 P.2d at 1044; *State v. Ridgely,* 732 P.2d 550, 554 (Alaska 1987).

21. *Ridgely,* 732 P.2d at 554 (citation omitted).

22. *Beavers,* 998 P.2d at 1044.

23. *Id.*

24. *Beavers,* 998 P.2d at 1046.

25. *Id.* at 1046 n. 30.

26. *Id.*

In *Beavers*, two Alaska state troopers questioned Beavers, who was then sixteen years old, while they were investigating two Anchorage robberies.[27] The troopers approached Beavers at the restaurant where he worked. They identified themselves and told Beavers that they wanted to question him outside of the restaurant to avoid the noise inside.[28] In an interview that lasted twenty-one minutes, the troopers talked to Beavers in their patrol car.[29] The troopers told Beavers that he was not under arrest and could leave at any time.[30] After Beavers answered several questions indicating his knowledge of a friend's involvement in some burglaries, Trooper Gerald Graham told Beavers that if he was involved in the burglaries, he needed to tell him.[31] Trooper Graham said that if he later found out that Beavers had been involved in the burglaries, having denied it, there would be "some problems."[32] After Beavers answered several questions concerning his friends and the location of various stolen items, Trooper Graham said that he knew Beavers was telling the truth because his statements were consistent with information from the trooper's prior investigation.[33] Trooper Graham then stated, "But, if . . . you try and hide it from me you're really going to get hammered."[34] After showing Beavers a photo lineup which included Beavers and one of his friends, Trooper Graham stated, "Now if you want to lie to me and get in more trouble, that's fine, okay?"[35] After this exchange, Beavers admitted his participation in the robbery, giving a detailed account.[36]

The superior court found that Beavers's confession was involuntary.[37] We reversed the superior court.[38] The supreme court reversed our decision. The supreme court emphasized that "[w]hen the accused is a juvenile, the state assumes a particularly heavy burden of proof."[39] The supreme court stated:

> A criminal suspect's right to remain silent represents one of the most fundamental aspects of our constitutional jurisprudence. It includes the right to terminate an interrogation at any time. We regard any potential encroachment upon this right with the utmost concern. A law enforcement officer's threat of harsher than normal treatment—however phrased—essentially conveys to criminal suspects that they will be punished for their silence, including any refusal to give further answers. . . . Suspects are told, in effect, that they must give up their constitutional right to silence or they will suffer greater punishment. We view such threats with disfavor. Where they are used, the resulting confession should be considered involuntary unless the state can show affirmatively that the confession was voluntarily made.[40]

The court then went on to discuss *United States v. Harrison*.[41] Harrison, investigating a noise outside her house, discovered approximately fifteen federal agents with weapons drawn.[42] After arresting Harrison and her companion, the agents searched her home.[43] The agents advised Harrison of her rights, and an agent informed her of the evidence linking her to money laundering.[44] According to the Alaska Supreme Court:

---

**27.** *Id.* at 1041.

**28.** *Id.*

**29.** *Id.* at 1042.

**30.** *Id.*

**31.** *Id.*

**32.** *Id.*

**33.** *Id.*

**34.** *Id.*

**35.** *Id.*

**36.** *Id.*

**37.** *Id.* at 1043.

**38.** *Id.*

**39.** *Id.* at 1044 (citation omitted).

**40.** *Id.* at 1045–46 (citations omitted).

**41.** 34 F.3d 886 (9th Cir.1994).

**42.** *Id.* at 890.

**43.** *Id.*

**44.** *Id.*

The agent then told Harrison that she could potentially receive a twenty-year sentence for her participation in the crime, and asked whether she thought it would be better if the judge was told of her cooperation or non-cooperation. Harrison responded that it would be better if the judge was informed of her cooperation, and she proceeded to confess her criminal involvement to the agents....

.... While expressing its continued adherence to the "totality of circumstances" approach, the court nevertheless established an exception for confessions induced by police threats to inform the prosecutor of a suspect's refusal to cooperate. According to the court, "there are *no* circumstances in which law enforcement officers may suggest that a suspect's exercise of the right to remain silent may result in harsher treatment by a court or prosecutor." [45]

The supreme court quoted the Ninth Circuit Court of Appeals:

Refusal to cooperate is every defendant's right under the [F]ifth [A]mendment. Under our adversary system of justice, a defendant may not be made to suffer for his silence. Because there is no legitimate purpose for the statement that failure to cooperate will be reported and because its only apparent objective is to coerce, we disapprove the making of such representations.[46]

The Alaska Supreme Court summarized:

The Ninth Circuit thus rejected the government's request to examine Harrison's inculpatory statement in context of all the circumstances involved in the case and held the agent's suggestion that he might inform the judge of Harrison's failure to cooperate inherently coercive.

We find *Harrison's* reasoning persuasive and agree with the Ninth Circuit's distinction between promises of leniency and threats of harsher treatment.[47]

*Applying this analysis to Waterman's November 19 statement*

Waterman was sixteen years old at the time of the November 19 interview. She was intelligent and a good student. She had not had any prior contact with the criminal justice system, although she had been interviewed twice before about her mother's death. She apparently went voluntarily to the police station.

When Waterman arrived at the police station, Trooper McPherron advised her of her rights. Waterman agreed to talk to the authorities. McPherron told her that she had a right to have her father present. Waterman declined. McPherron confirmed that she was talking with them voluntarily and assured her that she was free to go. Trooper McPherron then told Waterman that Arrant and Radel had told them "everything" about her participation in a plot to kill her mother. McPherron confronted Waterman with Arrant's and Radel's statements about their prior plots to kill her mother and their description of how the last plan was carried out. Waterman cried and acknowledged that she had mentioned killing her mother to Arrant and Radel, but insisted that she was not serious. She insisted that she had told them that she did not want them to do anything to her mother. Although Waterman admitted that she had told Arrant and Radel that she and her father would be out of town for the weekend, Waterman insisted that she had only brought it up in passing, telling them that her team was going to the state volleyball tournament. She admitted that she had "an idea" that they might do something to her mother that weekend, but she insisted that she "told them not to do it." Waterman claimed that she had telephoned Arrant from Anchorage because she knew that he and Radel were thinking about killing her mother, and she told them not to do anything. She stated that when she came back on Sunday, Arrant called her and told her that he had carried out the plan. Waterman said she was "horrified." She admitted that she

45. *Beavers,* 998 P.2d at 1046–47 (citations omitted).

46. *Id.* at 1047 (quoting *Harrison,* 34 F.3d at 891).

47. *Id.* (footnote omitted).

had not told anyone, including the police, that she knew what had happened to her mother.

At this point, Trooper McPherron told Waterman that although she was sixteen, this was a serious offense and she would be automatically waived into adult court; she would not be treated as a juvenile. She was now playing in the "big leagues." Trooper McPherron told Waterman that he did not understand why she continued to lie. If she continued to lie, it would be difficult for anyone to believe her. He told her, "A bunch of strangers are going to look at you and judge you based upon your behavior, based on how you deal with this, and how you answer these following questions."

Arguably, this speech constitutes a prohibited threat under *Beavers*—that is, a threat of harsher treatment if Waterman declined to cooperate. In *Beavers*, the Alaska Supreme Court expressed its approval of the Ninth Circuit's holding in *Harrison*. In *Harrison*, the agent, after telling Harrison that she could receive a 20–year sentence, asked Harrison "whether she thought it would be better if the judge were told that she had cooperated or not cooperated." [48] The Alaska Supreme Court noted with approval the Ninth Circuit's holding that the law enforcement officer's "suggestion that he might inform the judge of [the defendant's] failure to cooperate [was] inherently coercive." [49] Arguably, Trooper McPherron's statement was a similar threat that a jury would be told of Waterman's lack of cooperation.

 However, even if Trooper McPherron's statement was an improper threat under *Beavers*, we conclude that Waterman's statements directly following that exchange rebut the *Beavers* presumption of involuntariness. Under *Beavers*, a threat makes a defendant's statements following the threat "presumptively involuntary." [50] But if there is evidence "affirmatively indicating that the suspect's will was not overcome by the threats," the statements can still be voluntary. [51] Following Trooper

McPherron's statement, Waterman continued to insist that she had telephoned Arrant and told him not to go through with the murder. It thus seems clear that Waterman's will to resist was not overcome.

Later in the interview, Trooper McPherron suggested that they take a break. The officers were gone for about eight minutes. Then Sergeant Habib reentered the room. He told Waterman that three homicide investigators and crime lab technicians had been working on the case constantly for five days. They had gathered evidence and conducted numerous interviews. He claimed that the police had an airtight case against Arrant and Radel—they had confessed and told them all of the details about what happened. He further claimed that not only had Arrant and Radel told the police all about Waterman's involvement, but the police had other evidence of her involvement. He told Waterman that Trooper McPherron was one of the top homicide investigators and interviewers in the state. Sergeant Habib told her, "[McPherron's] got you. He's got you. He's got your involvement in this case." Habib then stated:

> You have a choice. And this is the only choice you have. This is the only decision you have to make right now. This is not a game. This is not high school.
>
> Do you want us to stand up with the district attorney and tell them that you cooperated? You screwed up? You weren't thinking? Or do you want us to stand up and say five days you lied to us? Down to the end when we present all this evidence in front of a jury, you continued to lie to us and bullshit us in trying to show us you're smarter? I'm tougher.
>
> MS. WATERMAN: I (indiscernible simultaneous speech). . . .
>
> SGT. HABIB: Listen to me. Do you want us to do that? Do you want a jury to hear that? Do you want a judge to hear that? Or do you want us to stand up and say this kid screwed up, she at least stepped up to the plate and was honest

---

**48.** *Harrison,* 34 F.3d at 890.

**49.** *Beavers,* 998 P.2d at 1047 (citation omitted).

**50.** *Id.* at 1048.

**51.** *Id.*

with us? Which one? Those are your two choices.

MS. WATERMAN: The first one.

SGT. HABIB: Then you need to start doing it. We're not dumb. That man is not dumb. You're giving him a little piece here trying to appease us. I'm sitting over here shaking my head watching you lie, and it's not helping you any. It's not helping you at all. He's pissed. He's ready to just go for it. Let's do it.

You're a kid. It's time to act like an adult. Now do you want to talk to him again and be straight with him? If you're straight with that man, I will stand up, he will stand up, and the DA will stand up and say she cooperated. It's your choice. That's where we're at.

■ In other words, Sergeant Habib threatened Waterman with harsher consequences for not cooperating with the investigators. As in *Harrison,* the officers had already told Waterman that she was facing a serious offense, would be waived into adult court, and that she would be playing in the "big leagues." She was told that a jury, "a bunch of strangers," would be judging her behavior and how she answered the questions. In his statements following the break, Sergeant Habib told Waterman that she had "one choice": Did she want the officers to tell the judge and jury that Waterman cooperated and had just made a mistake or did she want the officers to say that she had lied to them for five days? In our view, Sergeant Habib's statements constitute an impermissible threat under *Beavers.* The threats that Sergeant Habib made to Waterman are similar to the threats the *Beavers* court set out in discussing the *Harrison* case. Waterman was told that she faced harsh punishment as an adult. And Sergeant Habib made it clear that Waterman's cooperation or non-cooperation would be brought to the attention of the judge and jury. She was asked if she wanted the officers to be on her side and stand up and say she cooperated or whether she wanted them to say that she had continued to lie to them.

■ Waterman's statements following this threat no longer rebut the presumption of involuntariness. When Trooper McPherron reentered the room, Waterman apologized for her behavior. After Sergeant Habib's statements, Waterman made admissions that she was "pretty sure" that Arrant and Radel planned to kill her mother that weekend. Waterman conceded that, although she had talked to Arrant while she was away in Anchorage, she had not told Arrant that she had changed her mind and that he should not kill her mother. According to the analysis set out in *Beavers,* when the police use threats of harsher punishment to induce a confession, "the resulting confession should be considered involuntary unless the State can show affirmatively that the confession was voluntarily made." [52] Waterman made her admissions after Sergeant Habib's statements. Therefore, her statements are presumptively involuntary. We conclude that the evidence is insufficient to rebut the presumption.

The State argues that the facts in Waterman are not similar to the facts in *Beavers.* The State argues that Sergeant Habib did not threaten Waterman with harsher consequences if she did not choose to talk with them, but only told her truthfully what was going to happen at trial. The problem with the State's argument is that it seems to conflict with the Ninth Circuit's reasoning in *Harrison.* In *Beavers,* the Alaska Supreme Court quoted with approval the language in *Harrison* that "there is no legitimate purpose for the statement that failure to cooperate will be reported and because it's only apparent objective is to coerce, we disapprove the making of such representations." [53] The court's condemnation of such representations is sweeping. It appears to condemn such representations as coercive, even if they are true.

■ The State also argues that Sergeant Habib only suggested that Waterman would suffer consequences if she lied, not from exercising her right to remain silent. But Sergeant Habib's statements appear to be more coercive than the statements that the

---

52. *Id.* at 1046 (citation omitted).

53. *Id.* at 1047 (quoting *Harrison,* 34 F.3d at 891).

federal agent made in *Harrison.* The State may be arguing that Waterman had already given up her right to remain silent by talking to the police. But, as the Alaska Supreme Court pointed out in *Beavers,* the right to remain silent "includes the right to terminate an interrogation at any time." [54] And Sergeant Habib's statements seem more threatening than the statement the court found was inherently coercive in *Harrison,* that the agent might inform the judge that Harrison had not cooperated.[55]

In carrying out our duty to conduct an independent review of the voluntariness of Waterman's November 19 statement, we have carefully reviewed the videotape of the interview, as well as the transcript. We have reviewed and considered Judge Collins's findings. We conclude that most of Waterman's November 19 statement was voluntary. But we find that the statements Sergeant Habib made to Waterman after the break constituted threats that are forbidden under *Beavers,* and we conclude that the statements that Waterman made after those threats were involuntary and therefore must be suppressed.

*Why we conclude that we must remand the decision on whether to dismiss the indictment*

After she concluded that Waterman's November 19 interview was involuntary and therefore inadmissible, Judge Collins concluded that this interview "was the centerpiece of the grand jury case against Ms. Waterman." Judge Collins reasoned that since the indictment was based upon inadmissible evidence, the indictment should be dismissed.

On appeal, the State contends that, even if we affirm Judge Collins's decision that the interview is inadmissible, Judge Collins erred in dismissing the indictment. The State argues that it presented sufficient evidence to support the indictment even if Waterman's November 19 interview is inadmissible.

We held in *Stern v. State,*[56] that when inadmissible evidence is presented to a grand jury, the validity of the indictment will hinge on the answer to two questions: First, is the remaining evidence sufficient to support the indictment? And second (if the remaining evidence is sufficient), "[was] the probative force of [the] admissible evidence ... so weak and the unfair prejudice engendered by the improper evidence ... so strong that it appears likely that the improper evidence was the decisive factor in the grand jury's decision to indict"? [57]

Given our conclusion that only the final portion of Waterman's statement must be suppressed, it is obvious that the remaining evidence presented to the grand jury must now be reevaluated under the *Stern* test.

On this point, we note that the grand jury heard excerpts of the statements that Radel and Arrant gave to the authorities. However, when Judge Collins issued her ruling on the sufficiency of the indictment, she acknowledged that she did not know what evidence was contained in these excerpts because the transcript of the grand jury proceedings does not contain a transcription of these excerpts. (The grand jury transcript merely contains notations indicating that the excerpts were played.) To make a proper assessment of the indictment under the *Stern* test, Judge Collins must obtain copies or transcripts of these excerpts from Radel's and Arrant's statements.

*Conclusion*

Regarding the suppression of Waterman's statement, the decision of the superior court is AFFIRMED IN PART and REVERSED IN PART.

Regarding the validity of the indictment, the decision of the superior court is VACATED. The superior court is directed to reassess the validity of the indictment by evaluating the remaining admissible evidence under the *Stern* test.

**54.** *Id.* at 1045–46.

**55.** *Harrison,* 34 F.3d 886.

**56.** 827 P.2d 442 (Alaska App.1992).

**57.** *Id.* at 446 (citation omitted).

MANNHEIMER, Judge, concurring.

I write separately to address the issue of procedure presented in this case.

As explained by Judge Coats in the lead opinion, Judge Collins initially ruled (before trial) that Waterman's statement to the authorities was voluntary and admissible. Then, at the end of trial, when the judge was asked to rule on Waterman's motion for a judgement of acquittal, she issued a written decision that essentially contained two parts: a short denial of Waterman's request for a judgement of acquittal, followed by a lengthy *sua sponte* reconsideration and reversal of her earlier decision concerning the admissibility of Waterman's statement.

I concede that no statute or court rule required Judge Collins to alert the parties that the voluntariness of Waterman's statement was again at issue. I do note, however, that when Judge Collins decided to revisit this issue, she was not merely re-evaluating the evidence and law presented to her during the pre-trial litigation of this issue. Rather, the basis of her ruling was her *sua sponte* conclusion that the evidence presented at Waterman's trial differed significantly from the evidence presented during the pre-trial litigation of this issue—and that this new evidence required her to reverse her earlier decision.

This kind of judicial action presents three problems.

First, the judge's decision to revisit this issue *sua sponte* at the end of the trial might be perceived as unfair because the parties were not aware, when they were presenting their evidence at trial, that this issue was being litigated again—that the voluntariness of Waterman's statement was being re-assessed in light of the trial testimony. The content or detail of the testimony, and the types of questions posed to the witnesses, might have been significantly different if the parties had been aware that Judge Collins was re-evaluating this issue.

Second, because Judge Collins did not notify the parties that she was re-evaluating her earlier decision, she did not have the benefit of adversarial briefing and argument when she (1) analyzed the testimony presented at Waterman's trial, (2) compared that testimony to the evidence presented during the pre-trial litigation of this issue, and then (3) applied the law to the facts as she found them. As this Court noted in *State v. Angaiak*, when a court decides an issue *sua sponte*—that is, decides the issue without a request by a party, and without input from the parties—the court's action provides "fertile conditions for the creation of judicial error." 847 P.2d 1068, 1073 (Alaska App. 1993).

It is true that Judge Collins allowed the State to seek reconsideration of her ruling. But the fact that the issue was litigated in this manner illustrates the third problematic aspect of the procedure employed in this case.

Once a judge has publicly announced a decision (especially in writing), it is often psychologically difficult for the judge to admit that he or she might have acted precipitously and might have reached the wrong conclusion. One would hope that a judge would always have the candor (at times, the courage) to concede that an earlier decision was wrong. But as a practical matter, a lawyer asking for reconsideration of a publicly announced decision faces an uphill battle. For this reason, a lawyer's right to seek rehearing or reconsideration of an announced decision is not a ready substitute for the right to litigate the issue *before* the court publicly announces its decision.

As I said before, Judge Collins broke no rule of procedure when she decided, *sua sponte*, to re-evaluate the voluntariness of Waterman's statement after hearing the testimony presented at Waterman's trial. But I urge judges who face similar situations in the future to (1) give the parties notice that the issue is being reconsidered, (2) give the parties a description of the particular reasons why the earlier ruling is now perceived as wrong, and (3) allow the parties to brief or argue the issue before announcing a final ruling.