Filed 7/29/15  P. v. Nava CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B256120 |
| Plaintiff and Respondent, | |
| v. | (Los Angeles County Super. Ct. No. KA099654) |
| JARAD J. NAVA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Mike Camacho, Jr., Judge.  Affirmed with directions.

James M. Crawford, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Jason Tran and Herbert S. Tetef, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendant Jarad Jacob Nava of four counts of willful, deliberate, and premeditated attempted murder in violation of Penal Code sections 664 and 187, subdivision (a)[1] (counts 1-4), one count of shooting at an occupied motor vehicle in violation of section 246 (count 5), and one count of possession of a short-barreled shotgun in violation of section 33215 (count 6). With respect to all counts, the jury found that the offenses were committed for the benefit of, at the direction of, or in association with a criminal street gang. (§ 186.22, subd. (b)(1).) With respect to counts 1 through 5, the jury found that defendant and a principal personally and intentionally used and discharged a firearm, a handgun, within the meaning of section 12022.53, subdivisions (b) and (c) and that a principal personally and intentionally discharged a firearm that caused great bodily injury to the victim within the meaning of section 12022.53, subdivisions (d) and (e)(1).

The trial court sentenced defendant to 160 years to life for the four attempted murders, imposing 15 years to life for the substantive crimes and 25 years to life for the firearm enhancements, to run consecutively. The court stayed the sentence in count 5 under section 654. In count 6, the court imposed a consecutive midterm sentence of two years.

Defendant appeals on the grounds that: (1) the trial court prejudicially erred in admitting his police interview; (2) there was insufficient evidence to support the gang enhancement in count 6; (3) as a juvenile offender, defendant received a sentence that is the equivalent of life without the possibility of parole, resulting in a violation of the Eighth Amendment; and (4) the court erred in imposing a sentence of 15 years to life for the attempted murders and by imposing the minimum parole eligibility date of 15 years as well as the 25-years-to-life enhancements.

---

[1] All further references to statutes are to the Penal Code unless stated otherwise.

# FACTS

## Prosecution Evidence

On September 29, 2012, at approximately 10:50 p.m., Jessila Suarez, age 25, was driving her Lexus on Glen Avenue in Pomona accompanied by 17-year-old Marlyn R., 16-year-old Yesenia C., and 15-year-old Marlene C. Marlyn, who was pregnant, was sitting in the front passenger seat, and sisters Yesenia and Marlene were in the back.

Suarez was stopped at the traffic light at the intersection of Glen Avenue and Orange Grove Avenue and waiting to turn left when she saw the headlights of a vehicle approaching from behind. The vehicle, a white F-150 pickup truck, crossed over into the oncoming traffic lane and pulled up beside Suarez's driver's side window, which was lowered. The passenger in the front seat of the truck smiled at Suarez and pointed a gun at her. He said, "Bitch, you're gonna die today." He then fired the gun. Suarez heard numerous gunshots as she leaned over Marlyn to protect Marlyn's unborn child. Suarez decided to get away and accelerated while making a right turn onto Orange Grove Avenue. She drove her car to the Pomona Valley Hospital. Marlene was shot in the leg and Yesenia was shot in the back. The bullet in Yesenia's spine could not be removed and she is paralyzed and confined to a wheelchair as a result.

At the hospital, Yesenia told Pomona Detective Andrew Bebon that she had recognized the shooter as "Money" from the "D.C." tagging crew. Marlene also told Detective Bebon that the shooter was Money. Yesenia and Marlene knew Money from seeing him at Weber Park. Detective Bebon found a picture of defendant on defendant's Facebook page. Although the picture was of poor quality, he created a photographic lineup (six-pack) containing the photograph. Shortly after the shooting, Detective Bebon showed the six-pack to Suarez, Yesenia, and Marlene. Yesenia selected defendant from the six-pack. Suarez told Detective Bebon that the shooter used a revolver, and she saw a second person in the truck pointing a gun at them.

Police found five bullet casings at the shooting scene as well as bullets in the rear passenger seat and the trunk of Suarez's car. Ballistics tests showed that the bullet in the

3

trunk was fired from a .38-caliber revolver. The five bullet casings were fired from a semiautomatic pistol.

On October 5, 2012, the police arrested defendant and searched his apartment on North Park Avenue. Police found a loaded sawed-off shotgun with a 15-inch barrel in the bedroom defendant shared with his mother. Detectives Bebon and Michael Lange subsequently interviewed defendant at the Pomona police station. A videotape of the interview was played for the jury. Defendant admitted being a member of the DCK gang with the moniker "Money." At first he denied any involvement in the shooting. He said he was in Fontana that day when his mother called him and told him that someone shot his friend Joe in the leg and shot up the apartment house where his sisters lived. Defendant came home and stayed all night. He admitted knowing two of the victims and said Suarez was his cousin's girlfriend. The girls used to hang out at the same park that he frequented.

Defendant eventually admitted being in the shooter's truck, but he denied shooting a gun. He claimed he did not know the other people in the truck and said he heard gunshots but did not see a gun. Defendant finally admitted that he shot a .38-caliber revolver. He said he fired four shots while aiming downward. Defendant was in the front passenger seat, and "Browser" was driving the truck. Defendant said someone in the back was also shooting, but he did not know who it was. Defendant and the others were not looking for the victims—they just came across them. Defendant told detectives that members of the Cherrieville gang had been shooting at his gang. Defendant did not know what happened to the revolver.

When detectives asked defendant if he wanted to write an apology letter to the victims, defendant said he would. He wrote the following: "I'm sorry for what happened to [sic]. I feel very sorry for the things that happened. I hope you could forgive me. I know it's not gonna be easy because of what happened, but I hope that everything gets better and you heal quickly 100 percent. I'm also sorry to your family for the incident and all the heartache I may have caused. Jarad Nava." He admitted that the sawed-off shotgun was his. He said he got it from the "hood" for protection.

4

Detective Bebon created another six-pack containing defendant's booking photograph and showed it to Yesenia, Marlene, and Suarez. Yesenia and Suarez identified defendant as the shooter. Detective Bebon also created a six-pack containing the photograph of an Alex Sandoval, and Suarez identified him as the driver.

Approximately two weeks after the shooting, a detective found a .38-caliber revolver during a traffic stop of a car driven by Jesse Zamora. The gun was under the passenger seat. Ballistics testing showed that this gun fired the bullet found in the trunk of Suarez's car.

At trial, Suarez, Marlyn, Yesenia, and Marlene identified defendant as the shooter. Marlyn testified that she looked up defendant on Facebook when she learned his name from the subpoena for the preliminary hearing. She said she recognized defendant as the shooter when she saw his photograph on Facebook. Yesenia and Marlene had an older brother who was in the Cherrieville gang. Both Suarez and Marlyn had boyfriends who were members of the Cherrieville gang.

Detective Lange testified as a gang expert. He knew the "Don't Care Krew," or DCK, as a Pomona gang that began as a tagging crew. It had about 20 members. The primary activities of the gang included loitering, possession of narcotics and weapons, assault, assault with a deadly weapon, robbery, car theft, attempted murder, and witness intimidation. The gang's hangout was Weber Park. Detective Lange testified about two serious felonies committed by DCK gang members.

Detective Lange testified that defendant was an active member of DCK, and his moniker was "Money." Defendant has tattoos showing his gang membership. Detective Lange knew Alex Sandoval as "Browser" and the leader of the DCK gang. Jesse Zamora was an associate of DCK. Approximately one month before the shooting in this case, DCK and Cherrieville became rivals. On the day the girls were shot, there were several shooting incidents involving the two gangs. Joseph Muatiel, a DCK member, was shot around 9:10 p.m. outside a house on North Park Avenue.

When given a hypothetical question based on the facts of this case, Detective Lange testified that in his opinion the shooting was committed for the benefit of the DCK

5

gang.  With respect to another hypothetical question based on defendant's possession of a short-barreled shotgun, Detective Lange testified that the shotgun was possessed for the benefit of the DCK gang.

**Defense Evidence**

Defendant did not testify or present evidence on his behalf.

**DISCUSSION**

## I.  Admission of Defendant's Interview Statement

### A.  *Defendant's Argument*

Defendant contends that his statement to police was coerced because it was the product of intimidation by two skilled interrogators who threatened him with life in prison if he did not tell the truth.  The involuntary statement was obtained in violation of his Fifth Amendment right against self-incrimination, and its admission cannot be found harmless beyond a reasonable doubt.  (*Chapman v. California* (1967) 386 U.S. 18.)

### B.  *Proceedings Below*

The defense filed a motion to exclude defendant's statements to police during a custodial interrogation.  At the hearing on the motion, Detective Bebon testified that defendant was arrested two or three hours before his interview at the police station.  The interview was recorded at 7:40, and the video and audio were played at the hearing.  Defendant was not in handcuffs when Detective Bebon advised him of his *Miranda*[2] rights by reading them from a card.  Defendant was 17 years old at the time of the interview.

Defendant testified at the hearing that when he was arrested, Detective Bebon told him he was not going to ever get out again.  He was arrested at about 5:00 p.m., and the police were at his house for about 15 minutes.  When he was placed in handcuffs and told to sit on the grass in front of the apartments, they told him to enjoy his last time ever touching grass.  He was sitting handcuffed in the interview room for four or five hours

---

[2]     *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

without water while he waited to be interviewed.  He did not use the restroom.  He had never been interrogated by police before and did not really understand what the detective was talking about when he said he was going to read defendant his rights.  He had only been to 10th grade.  He was tired and figured he would have to say something so that the police would take him to juvenile hall.  He wanted to go to juvenile hall because he was tired of being in the room.

On cross-examination, he acknowledged that if the interview began at 7:40 p.m., he could not have been in the room for four or five hours.  He acknowledged he was offered water and refused.  Even though he answered "yes" to the questions in the *Miranda* waiver, he was not fully aware of what was going on.  Defendant stated English was his only language.

The court heard argument on the narrow issue of whether there was a knowing and intelligent waiver of *Miranda* rights.  The defense argued that defendant felt pressured and was scared.  He was behind in his education.  He answered "yes" to the questions even though he did not really understand them, and it was reasonable to infer he was afraid to disagree with the police.  The prosecution argued that defendant was less than truthful about the time and circumstances of the interview.  There was no harassment, and there were no threats, as clearly seen on the video.  Defendant was advised of his rights in his native language.  He said he understood those rights, and he began to respond to the detectives' questions.

The court found defendant's testimony "completely incredible" and denied the motion.  The court noted that the video of the interview showed he was not an impressionable youngster.  The interview took place in the afternoon and evening hours, and defendant showed no signs of fatigue.  He did not complain about anything, and he said he was okay when asked.  The court saw no signs of coercion.

### C.  Relevant Authority

"In considering a claim that a statement or confession is inadmissible because it was obtained in violation of a defendant's rights under *Miranda* [], the scope of our review is well established.  'We must accept the trial court's resolution of disputed facts

7

and inferences, and its evaluations of credibility, if they are substantially supported. [Citations.] However, we must independently determine from the undisputed facts, and those properly found by the trial court, whether the challenged statement was illegally obtained.' [Citations.] We apply federal standards in reviewing defendant's claim that the challenged statements were elicited from him in violation of *Miranda*. [Citations.]" (*People v. Bradford* (1997) 14 Cal.4th 1005, 1032-1033.) In independently determining whether the challenged statements were illegally obtained, we "'"'give great weight to the considered conclusions' of a lower court that has previously reviewed the same evidence." [Citations.]'" (*People v. Whitson* (1998) 17 Cal.4th 229, 248.)

A voluntary waiver of a defendant's rights is the product of a free and deliberate choice, made with a full awareness of the nature of the rights abandoned and the consequences of the decision to waive that right. (*Moran v. Burbine* (1986) 475 U.S. 412, 421.) In assessing whether these criteria were met, we must consider the totality of the circumstances while bearing in mind the particular background, experience and conduct of the suspect. (*North Carolina v. Butler* (1979) 441 U.S. 369, 374-375.)

### D. Defendant's Motion Properly Denied

We agree with the trial court that defendant's waiver of his *Miranda* rights was voluntary, intelligent, and knowing. Our independent review of the recording and transcript of the interview leads us to conclude that the totality of the circumstances support the trial court's finding. As the transcript and video show, Detective Bebon read defendant each of his rights. Defendant answered "Yes, sir" when asked if he understood each of the rights. When asked if, having these rights in mind he wanted to talk to the detectives, defendant answered, "Yes, sir."

Defendant's claim rests principally on the suggestion the detectives made to him that he could face life in prison if he did not start telling the truth. Defendant argues he was led to believe he was never going to get out ever again. Also, Detective Bebon told defendant that his coperpetrator was scared to death, saying "He's scared of life and he's going to be scared of that." Detective Lange then said that all the coperpetrator had to do was "come up and tell us what he knows, or we can hear it from you, okay?" Because of

8

these threats, defendant claims, he assumed he had to say something so that he could go to juvenile hall.

The prelude to defendant's admissions does not reveal egregious conduct by the detectives such that his will was overborne. Defendant relies on *United States v. Harrison* (9th Cir. 1994) 34 F.3d 886 for the proposition that, although a suggestion of leniency to a suspect in exchange for cooperation may be proper, law enforcement officers may never suggest that a suspect's exercise of the right to remain silent could result in more severe treatment by a court or a prosecutor. (*Id.* at pp. 891-892.) In *Harrison*, the suspect was asked if she thought it preferable if the judge were informed that she had cooperated or not cooperated. Only then did she make a statement to law enforcement. We agree that this type of suggestion to a suspect could be interpreted as akin to threatened retaliation by law enforcement, but there were no similar statements made to defendant, and *Harrison* is therefore of little significance in defendant's case. The detectives did not tell defendant at any time that he would receive more severe treatment if he did not admit to being one of the shooters. The detectives were merely exhorting defendant to tell the truth by offering him explanations for his acts—telling him they understood that "everything in life has explanations," that his family had been shot at, that they understood he may have suffered from peer pressure, and that "sometimes people shoot and try not to hit something." The detectives never said to defendant that he would never get out, as defendant claims.

As noted in *People v. Jones* (1998) 17 Cal.4th 279, 297-298, "[t]he business of police detectives is investigation, and they may elicit incriminating information from a suspect by any legal means. '[A]lthough adversarial balance, or rough equality, may be the norm that dictates trial procedures, it has never been the norm that dictates the rules of investigation and the gathering of proof.' [Citation.] 'The courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable.' [Citation.]" (*Id.* at pp. 297-298.) The means used by Detectives Bebon and Lange were far from coercive. They did not even have to pretend they knew much more than they did, because they

already knew quite a lot, and it appeared to be the detectives' knowledge about what occurred that most influenced defendant. The video reveals the detectives spoke calmly. Defendant was not handcuffed, and he appeared relaxed. Accordingly, the circumstances surrounding defendant's confession do not establish "prejudicial deception," since the detectives did nothing that was likely to result in an untruthful confession. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1241; *Jones*, at pp. 299.) Defendant's statement was voluntary.

## II. Sufficiency of the Evidence for Count 6 Gang Enhancement

### A. Defendant's Argument

Defendant contends there was no evidence he possessed the requisite specific intent to benefit, promote, or assist DCK by possessing a sawed-off shotgun in his bedroom, nor even evidence from which such an intent could be inferred. There was nothing to establish that the offense in count 6 had any gang connection. Therefore, defendant argues, this court should reverse the true finding on the gang enhancement in count 6 as well as the resulting sentence.

### B. Relevant Authority

"The role of an appellate court in reviewing the sufficiency of the evidence is limited. The court must 'review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.]" (*People v. Ceja* (1993) 4 Cal.4th 1134 , 1138; see *People v. Martinez* (2008) 158 Cal.App.4th 1324, 1331-1334 [applying the substantial evidence test to the defendant's claim that a § 186.22, subd. (b) gang enhancement was unsupported by the evidence].)

### C. Proceedings Below

Detective Bebon testified that on the day defendant was arrested, he searched the apartment inhabited by defendant, his mother, and his aunt. In a closet in the bedroom occupied by defendant and his mother, the detective found a loaded, sawed-off shotgun. During the subsequent interview the detective conducted with defendant, the detective

stated, "I found a shotgun in your mom's room.  Whose is that?"  Defendant replied, "Probably mine."  When asked where he got it, defendant said, "From the hood."  He said, "It was 'cause just for protection."  When Detective Bebon asked, "Browser gave it to you?  Johnny Bravo gave it to you?," defendant's reply was unintelligible.

The prosecutor presented Detective Lange, the gang expert, with the following hypothetical:  "Assume it's October 5, 2012, a DCK gang member is in possession at his residence of a short-barreled shotgun, which is stored at 69[4] North Park Avenue in the city of Pomona in his apartment in his closet.  He's interviewed by the police and indicates the shotgun is for protection.  Do you have an opinion as to whether or not this crime was committed for the benefit of, at the direction of, or in association with a criminal street gang?"

Detective Lange replied that in his opinion, "he's protecting not only himself but other gang members in case a rival comes by."  The prosecutor stated, "So, just to be clear, how does it benefit the individual DCK gang member as to this particular hypothetical?"  The detective replied, "This particular hypothetical, he has the means to possess and use a shotgun in case somebody drives by, simply a rival or enemy, that he can arm himself with."  When asked how the gang as a whole benefitted, the detective stated, "Mere possession of a—of a gun is not the same, but when you're in an area that is a known stronghold of a gang and you possess this type of weapon, there's— there's certain—probabilities go higher that you might encounter a rival gang member.  And in this, to me, it's my opinion that it would benefit him or anybody else from that gang if he had the ability to arm himself with it."

### D.  Enhancement Properly Imposed

We believe there was sufficient evidence for the jury to find that defendant possessed the gun for the benefit of and in association with a criminal street gang.  The jury was instructed that to prove the gang allegation, the People had to show defendant committed the crime for the benefit of, at the direction of, or in association with a criminal street gang and that defendant intended to assist, further, or promote criminal conduct by gang members.  (CALCRIM. NO. 1401.)  It is true that not every crime

11

committed by gang members is related to a gang. (*People v. Albillar* (2010) 51 Cal.4th 47, 60.) In the instant case, however, the expert's testimony and the circumstances under which defendant possessed the shotgun, combined with defendant's own words, justify the jury's true finding.

Detective Lange testified that gang members are expected to participate in any shooting or assault to support their gang at any time. Among the primary activities of DCK, Detective Lange named possession of weapons and assaults with a deadly weapon. Gang members commonly carry weapons for self-defense and defense of the other members. In anticipation of chance opportunities or when rivals come into the neighborhood, they want to arm themselves to defend themselves and everyone else. The building at 694 North Park Avenue, where defendant lived, was a main hangout for the DCK gang. About a month before September 2012, when the instant shooting occurred, DCK and Cherrieville began a rivalry. On the day defendant shot into Suarez's car, there had been a series of shootings near his apartment building. Many times it is difficult for gang members to get weapons, so they have "hood guns" or "burner guns" that are shared among the gang members in order to put in work against rivals. When asked where he obtained the gun, defendant said he got it from the "hood" for protection, which corresponds precisely to Detective Lange's explanation of how and why gang members possess guns. Hence, the jury reasonably found that count 6 was a gang crime.

Defendant relies on *In re Daniel C.* (2011) 195 Cal.App.4th 1350 (*Daniel C.*), in which the reviewing court found the gang expert's testimony constituted insufficient evidence to support a true finding on the allegation that Daniel committed a robbery with the specific intent to promote, further, or assist in criminal conduct by gang members. (*Id.* at pp. 1353, 1364.) In that case, Daniel and two other young men were observed walking back and forth inside a market. After his two companions left the store, Daniel picked up a bottle of Jack Daniels from the liquor aisle and headed toward the exit without making any effort to pay. (*Id.* at p. 1353.) When Daniel was confronted by a manager and attempted to flee, he accidentally broke the bottle and then hit the manager on the head with the broken bottle, causing injury. (*Ibid.*) Daniel got into a truck that

12

was waiting with the engine running. The truck was later stopped with Daniel and three companions inside. (*Ibid*.)

At Daniel's jurisdictional hearing, a gang expert testified that Daniel and two of his companions were members of the Norteno gang or an affiliate. (*Daniel C*., *supra*, 195 Cal.App.4th at p. 1355.) The expert believed the robbery was gang related because of the gang affiliations of Daniel and two of his companion, the fact that they coordinated their actions in the market, the fact they were all wearing clothing containing red (their gang's color), and the presence of crowbars and a baseball bat in the truck. (*Id*. at p. 1356.) Daniel testified that he took the bottle on impulse and was not a Norteno. He had friends who were both Norteno and Sureno gang members. (*Id*. at p. 1357.)

The reviewing court agreed with the juvenile court that the crime was committed in association with a criminal street gang within the meaning of the statute. (*Daniel C*., *supra*, 195 Cal.App.4th at pp. 1358-1359.) It concluded, however, there was a lack of evidence showing the specific intent requirement. The court discounted the expert's testimony and concluded there was no evidence Daniel acted in concert with his companions, or that his companions committed any crime. Neither defendant nor his companions did anything to identify themselves as gang members other than wearing clothing with the color red, and there was no evidence the young men entered the store with the intention of committing a violent crime. (*Id*. at pp. 1361-1363.)

In the instant case, the factors the *Daniel C*. court found significant do not apply. First, the expert's testimony was not the only factor in support of the true finding. As noted, defendant acknowledged he received the gun from his "hood," which, as explained by the expert testimony, can be understood to mean his gang. Unlike the robbery and use of a deadly weapon in *Daniel C*., the possession of the sawed-off shotgun was a passive crime. Defendant held the shotgun for future use, as he acknowledged. A reasonable jury could infer that his intent in holding the gun for this future use was to assist in a criminal gang-related incident. "There is rarely direct evidence that a crime was committed for the benefit of a gang. For this reason, 'we routinely draw inferences about intent from the predictable results of action. We cannot look into people's minds directly

13

to see their purposes. We can discover mental state only from how people act and what they say.' [Citation.]" (*People v. Miranda* (2011) 192 Cal.App.4th 398, 411-412.)

In *In re Frank S.* (2006) 141 Cal.App.4th 1192, the court concluded there was insufficient evidence to support a gang enhancement when the minor was found to have carried a concealed dirk or dagger. (*Id*. at pp. 1194-1195.) The court stated that the prosecution "did not present any evidence that the minor was in gang territory, had gang members with him, or had any reason to expect to use the knife in a gang-related offense." (*Id*. at p. 1199.) In the instant case, however, there was evidence that defendant was given the sawed-off shotgun by his gang members, he kept it in the apartment that was located in his gang's territory during a time of violent rivalry with another gang, and there was every reason to believe defendant expected to use the gun in a gang-related incident, since it was for his "protection."

In *People v. Ramon* (2009) 175 Cal.App.4th 843, 846, the defendant was convicted of, inter alia, possession of a stolen vehicle and possession of a firearm by a felon. (*Ibid*.) The court found the evidence that the perpetrators were gang members and the crime was committed in the gang's territory was insufficient to support the gang enhancement. (*Id*. at p. 851.) The court noted that its analysis might be different if the expert's opinion had included "'possessing stolen vehicles'" as one of the gang's activities. (*Id*. at p. 853.) Here, the expert testified that weapons violations were among the DCK gang's activities, further supporting the inference that defendant possessed the gun with the required specific intent.

In the instant case, the circumstances surrounding defendant's possession of the sawed-off shotgun, i.e., defendant's admitted gang membership, the location of defendant's apartment in a DCK area during a period of violent gang conflict, and his obtaining of the shotgun from his "hood," for protection clearly constituted sufficient evidence, combined with the expert opinion, to support the true finding in count 6.

14

## III. Cruel and Unusual Punishment

### A. Defendant's Argument

Defendant contends that because the length of time he must serve to become eligible for parole is likely to be his entire life span, his sentence is the equivalent of life without parole (LWOP).  Therefore, his sentence violates the Eighth Amendment and must be vacated in light of *Miller v. Alabama* (2012) 567 U.S. ___ [132 S.Ct. 2455] (*Miller*) and *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*).

### B. Relevant Authority

*Caballero* noted that the court in *Graham v. Florida* (2010) 560 U.S. 48 (*Graham*) observed that "[n]o legitimate penological interest . . . justifies a life without parole sentence for juvenile nonhomicide offenders." (*Caballero*, *supra*, 55 Cal.4th at p. 266.) In summarizing *Graham*'s holding, the *Caballero* court stated "that the Eighth Amendment requires the state to afford the juvenile offender a 'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation,' and that '[a] life without parole sentence improperly denies the juvenile offender a chance to demonstrate growth and maturity.'" (*Caballero*, at p. 266.)

The *Caballero* court went on to explain that the scope and application of *Graham*'s holding were clarified in *Miller*.  (*Caballero*, *supra*, 55 Cal.App.4th at p. 267.) "In *Miller*, the United States Supreme Court extended *Graham*'s reasoning (but not its categorical ban) to homicide cases, and, in so doing, made it clear that *Graham*'s 'flat ban' on life without parole sentences for juvenile offenders in nonhomicide cases applies to their sentencing equation regardless of intent in the crime's commission, or how a sentencing court structures the life without parole sentence.  [Citation.]  The high court was careful to emphasize that *Graham*'s 'categorical bar' on life without parole applied 'only to nonhomicide crimes.'  [Citation.]  But the court also observed that "none of what [*Graham*] said about children—about their distinctive (and transitory) mental traits and environmental vulnerabilities—is crime-specific. Those features are evident in the same way, and to the same degree, when . . . a botched robbery turns into a killing.  So *Graham*'s reasoning implicates any life-without-parole sentence imposed on a juvenile,

15

even as its categorical bar relates only to nonhomicide offenses.' [Citation.] *Miller* therefore made it clear that *Graham*'s 'flat ban' on life without parole sentences applies to all nonhomicide cases involving juvenile offenders, including the term-of-years sentence that amounts to the functional equivalent of a life without parole sentence imposed in this case." (*Caballero*, at pp. 267-268.)

   *Caballero* ultimately held that, consistent with *Graham*, "sentencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy constitutes cruel and unusual punishment in violation of the Eighth Amendment. Although proper authorities may later determine that youths should remain incarcerated for their natural lives, the state may not deprive them at sentencing of a meaningful opportunity to demonstrate their rehabilitation and fitness to reenter society in the future. Under *Graham*'s nonhomicide ruling, the sentencing court must consider all mitigating circumstances attendant in the juvenile's crime and life, including but not limited to his or her chronological age at the time of the crime, whether the juvenile offender was a direct perpetrator or an aider and abettor, and his or her physical and mental development, so that it can impose a time when the juvenile offender will be able to seek parole from the parole board. The Board of Parole Hearings will then determine whether the juvenile offender must be released from prison 'based on demonstrated maturity and rehabilitation.' [Citation.]" (*Caballero*, *supra*, 55 Cal.4th at pp. 268-269.)

   The *Caballero* court urged the Legislature to establish a parole-eligibility mechanism for juvenile defendants serving a de facto life sentence without possibility of parole for a nonhomicide crime or crimes. (*Caballero*, *supra*, 55 Cal.4th at p. 269, fn. 5.) In response, the Legislature enacted section 3051 effective January 1, 2014. Section 3051, subdivision (a)(1) provides that "any prisoner who was under 18 years of age at the time of his or her controlling offense" shall be afforded a "youth offender parole hearing." The timing of the hearing is determined by the length of the sentence imposed. Juveniles who are sentenced to an indeterminate base term of 25 years to life, as was

defendant, will receive a hearing during the 25th year of incarceration. (§ 3051, subd. (b)(3).)

Whether or not the mechanism provided by section 3051 is sufficient to comply with the mandate of *Graham*, *Miller*, and *Caballero* is currently before the California Supreme Court in a case decided by this court, i.e., *In re Alatriste and Bonilla* (2013) 220 Cal.App.4th 1232, review granted February 19, 2014 (S214652 [*Alatriste*] and S214960 [*Bonilla*].) We concluded that section 3051 does provide "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation," as required by *Graham*. (*Graham*, *supra*, 560 U.S. at p. 75.) We reach the same conclusion in the instant case. Therefore, defendant's sentence is not unconstitutional as the functional equivalent of life without the possibility of parole.

## IV. Alleged Errors in Sentencing

### A. Defendant's Argument

Defendant first contends the trial court erred in sentencing him to 15 years to life when the sentence for premeditated and deliberate attempted murder is life imprisonment with the possibility of parole. Second, he contends the trial court erred in imposing both the extended parole eligibility limitation under section 186.22, subdivision (b)(5) and the sentencing enhancement provision under section 12022.53, since this constituted an improper dual use of facts.

### B. Sentencing on Gang Enhancements and Firearm-Use Enhancement Proper

Defendant is correct that the sentence for the crime of attempted willful, deliberate, and premeditated murder is imprisonment for life with the possibility of parole. (§ 664, subd. (a).) In defendant's case, however, in each of counts 1 through 4, the jury found the gang allegation under section 186.22, subdivision (b) to be true. Section 186.22, subdivision (b)(5) provides that, with certain exceptions inapplicable here, "any person who violates this subdivision in the commission of a felony punishable by imprisonment in the state prison for life shall not be paroled until a minimum of 15 calendar years have been served." Accordingly, the better terminology for describing defendant's sentence in counts 1 through 4 would be "life imprisonment with a minimum

17

term of 15 years," or "life with a minimum parole eligibility term of 15 years," although trial courts commonly express the sentence in the same way the trial court did in this case. Indeed, the abstract of judgment form does not appear to readily allow for variation from the phrasing used by the trial court here. Nevertheless, we shall order the amendment of the abstract of judgment to reflect the precise terminology, although the present wording does not prejudice defendant.

We reject defendant's second allegation of sentencing error. Attempted murder is punishable by life imprisonment with the possibility of parole if the attempt was willful, deliberate, and premeditated. (§ 664, subd. (a).) A prisoner sentenced to life in prison ordinarily must serve a minimum term of seven years before being eligible for parole. (§ 3046, subd. (a)(1).) As we have noted, section 186.22, subdivision (b)(5) is an alternate penalty provision that increases the minimum parole eligibility term from seven to 15 years. (*People v. Montes* (2003) 31 Cal.4th 350, 353, fn. 3.)

Section 12022.53 provides for prison terms for defendants convicted of certain felonies who personally used a firearm, personally and intentionally discharged a firearm, or personally and intentionally discharged a firearm proximately causing great bodily injury or death. (*People v. Brookfield* (2009) 47 Cal.4th 583, 589 (*Brookfield*).) The terms provided for in section 12022.53 must be imposed in addition to and consecutive to the term imposed for the underlying crime. (§ 12022.53, subds. (b), (c), (d).) Section 12022.53, subdivision (e)(1) provides that these enhancements may be extended to include any defendant who was a principal in the commission of the offense if the prosecution pleads and proves that (1) the defendant committed the offense to benefit a criminal street gang within the meaning of section 186.22 subdivision (b)(1) and (2) a principal in the offense personally used a firearm or personally and intentionally discharged a firearm. (*Brookfield*, at p. 590.)

Accordingly, a defendant who *personally* used a firearm or personally and intentionally discharged a firearm in committing an offense to benefit a criminal street gang within the meaning of section 186.22, subdivision (b)(1) is subject to both an enhancement under section 12022.53 and increased punishment under section 186.22.

18

(*Brookfield*, *supra*, 47 Cal.4th at p. 590; *People v. Gonzalez* (2010) 180 Cal.App.4th 1420, 1425.)

In the instant case, in each of counts 1 through 4, the jury found that defendant *personally* used and *personally* discharged a firearm within the meaning of section 12022.53, subdivisions (b), (c), and (e)(1). The jury also found that a principal personally used and discharged a firearm and caused great bodily injury to Yesenia C. within the meaning of section 12022.53, subdivisions (b), (c), (d), and (e)(1). Section 12022.53, subdivision (e)(2) prevents a trial court from imposing punishment under both sections 12022.53 and 186.22 only when the defendant did not personally use a firearm in the commission of the offense. (*Brookfield*, *supra*, 47 Cal.4th at pp. 594-596; *People v. Gonzalez*, *supra*, 180 Cal.App.4th at p. 1425.) Therefore, the trial court did not err in imposing both the firearm enhancement and the minimum parole eligibility term in this case.

## DISPOSITION

The judgment is affirmed. The superior court is directed to amend the abstract of judgment to reflect that defendant's sentence in each of counts 1 through 4 is life with a 15-year minimum parole eligibility date plus 25 years to life. The clerk of the superior court is ordered to forward the amended abstract of judgment to the Department of Corrections and Rehabilitation.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


                                    BOREN, P. J.

We concur:


    ASHMANN-GERST, J.


    CHAVEZ, J.


19